2023 IL App (2d) 210715-U
No. 2-21-0715
Order filed November 8, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of DuPage County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No.17-CF-2205 |
| CASEY R. HAGESTEDT, | ) ) | Honorable Ann Celine O'Hallaren Walsh |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Justice Hutchinson specially concurred in the judgment.
Presiding Justice McLaren dissented.

**ORDER**

¶ 1    *Held*:   The trial court did not err when it denied defendant's motion to suppress evidence where police officers' entry into defendant's home was justified and police did not violate the Fourth Amendment in arriving at the place from which evidence could be plainly viewed with the aid of a flashlight.

¶ 2    In September 2021, defendant, Casey R. Hagestedt, entered into a partially negotiated plea agreement resolving three unrelated felonies and a stipulated bench trial in the instant (unlawful possession of a controlled substance (720 ILCS 570/402(c) (West 2016)) case, in order to preserve his right to appeal the trial court's order denying his motion to suppress evidence. On December 6, 2021, defendant was sentenced to a concurrent term of probation, 180 days in the county jail

with credit for 126 days served and relevant fines, costs, and fees. Defendant now appeals the denial of his motion to suppress evidence and resulting conviction. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On the morning of October 19, 2017, Roselle police officers Robert Liebich and Kyle Stanish responded to a call to assist the Roselle Fire Department personnel who were about to force entry into defendant's residence to address a natural gas leak. Upon arrival, the fireman had already gained entry to defendant's townhome. The source of the gas leak was the stove in defendant's kitchen. The odor of gas was still pretty strong and the fire department had begun ventilating the home with fans. Officer Stanish was told that a male, later determined to be defendant, was laying in the bedroom and was refusing to come out so his health could be assessed.

¶ 5     Officer Stanish went into the bedroom in an effort to talk defendant into going outside to be assessed by paramedics. Officer Liebich went into the kitchen to check on the stove. As he was leaving the kitchen, Liebich noticed a kitchen cabinet, across from the stove and above the countertop, that was chained and padlocked. Using his flashlight and without touching the cabinet, Liebich was able to see inside the cabinet and saw individual packages of a green leafy substance that looked to be cannabis as well as some syringes. Liebich notified Officer Stanish that there was cannabis in one of the kitchen cabinets. Stanish went into the kitchen and pulled on the chain that was wrapped around the cabinet door handles and saw the cannabis and syringes. Stanish then went back to the bedroom to speak to defendant. Defendant denied knowledge of what was in the kitchen cabinet and agreed to go outside.

¶ 6     Officer Stanish contacted a supervisor who spoke to someone at the State's Attorneys Office, who advised the police to get a search warrant for defendant's residence. A search warrant

for defendant's residence was obtained and executed. Forensic testing showed that the items seized from the cabinet contained cannabis and less than 15 grams of a mixture of heroin, fentanyl, and cocaine. Defendant was charged by complaint with one count of unlawful possession of a controlled substance (720 ILCS 570/402(c) (West 2016)), one count of unlawful possession of cannabis (720 ILCS 550/4(c) (West 2016)), and one count of possession of drug paraphernalia (720 ILCS 600/3.5) (West 2016)). Defendant was later indicted on the controlled substance charge.

¶ 7                                    A. Defendant's Motion to Suppress

¶ 8     Defendant's "Motion to Quash Arrest and Suppress Evidence" acknowledged that one of the established "exceptions to the warrant requirement is the community caretaking or public safety exception, first recognized and discussed at length in *Cady v. Dombrowski*, 413 U.S. 433 (1973) and discussed in the Second District Appellate Court of Illinois in *People v. Lewis*, 363 Ill. App. 3d 516 (2006)." Defendant's motion alleged that the sole purpose of the officers' entry into the residence was "to attempt to convince the Defendant to come out." Defendant's motion argued that:

"Community caretaking refers to a capacity in which the police are performing acts unrelated to the investigation of a crime. [Citation.] There are two general criteria to consider in determining whether the community caretaker exception applies. [Citation.] First, law enforcement officers must be performing some function other than the investigation of a crime, and second, the search or seizure must be reasonable because it was undertaken to protect the safety of the general public.

More specifically, the Second District has discussed criteria governing emergency-assisted searches and held "that the validity of an emergency-assistance search must be determined solely by (1) whether there are reasonable grounds to believe that there is an

- 3 -

emergency that requires immediate assistance; and (2) whether there is a reasonable basis, approximating probable cause, to associate the emergency with the area searched. [Citation.]'

In this case, even if the Officers were justified in entering the Defendant's home to assist the Fire Department in attempting to convince the Defendant to leave, their actions exceeded the Fourth Amendment exception when Officer Liebich entered the kitchen because (1) the Officers had already been informed that the Defendant was in the bedroom, (2) the Officers had already been informed that the source of gas had been located and dealt with by the Fire Department, and (3) the Officers had already been informed that members of the Fire Department had searched the home and that the Defendant was the only person inside.

Since the actions of the officers, in entering the kitchen and looking into the kitchen cabinets, exceeded any exceptions to the requirement for a warrant, those actions constituted an impermissible search of the Defendant's home."

Defendant cited *People v. Henderson*, 2013 IL 111404, ¶ 33 (neither the search warrant nor the complaint for search warrant were attached as an exhibit to defendant's motion) to argue that, because "the search was obtained as a result of the items observed during this unlawful search," all items seized during the execution of the search must be suppressed.

¶ 9                                B. Evidentiary Hearing

¶ 10    Prior to commencing the hearing, the State submitted a list of potential witnesses and the case law that the parties would be relying on. The State listed *People v. Leudemann*, 222 Ill.2d 530 (2006) and *Brigham City v. Stewart*, 547 U.S. 398 (2006). Defendant listed *People v. Lewis*, 363 Ill. App. 3d 516 (2006); *People v. McDonough*, 239 Ill. 2d 260 (2010); and *People v. Humphrey*,

361 Ill. App. 3d 947 (2005). The trial court remarked that it had reviewed the pleadings and the case law. Both parties waived opening statement.

¶ 11    Defendant called Roselle police officer David Liebich. On October 19, 2017, Liebich was dispatched to 561 Forum Drive in Roselle in order to assist the fire department regarding a "gas leak." The dispatch said nothing about "any sort of criminal activity." Upon his arrival, the fire department was already on scene and the smell of gas was still pretty strong.[1] The residence was a townhome connected to other residences. The fire department had begun airing out the residence. Liebich was told that "they had already determined the source of the gas," but he "wasn't sure about them having it shut off yet, but, yes, they had started ventilating." When he entered the residence, he went to the right through the living area and into the kitchen. While in the kitchen, Liebich noticed "a cabinet that had a chain padlock on it." The cabinet was opposite from the stove in the kitchen. Liebich identified defendant's exhibits 1 (a photo of the kitchen) and 2 (a photo of the cabinet with the chain and lock). The padlock was locked. Liebich was equipped with a flashlight, which he used "to look inside the cabinet." Liebich "did not touch the cabinet," but he did use his flashlight to look inside of it. When he looked inside the cabinet, Liebich saw "a green leafy substance that was packaged individually and looked to be cannabis" and "some syringes." Liebich relayed what he had observed to Officer Stanish.

¶ 12    On cross-examination, Liebich identified State's exhibits 1 through 4. State's exhibit 1 is an aerial photo of defendant's townhome and other buildings; State's exhibit 2 is the open front door to defendant's residence; State's exhibit 3 is a photograph of the interior of the defendant's

---

[1]Natural gas is odorless so companies add an odorant component (usually mercaptan) to give it a distinctive rotten egg smell. https://energencyeducation.ca/encyclopedia/mercaptan

residence as you enter; and State's exhibit 4 is a photograph of the living room when one looks right after entering through the front door. In order to get to the kitchen, one has to pass through the living room. Liebich testified that there were four firemen on scene when he arrived. He was not told about "the male individual inside the residence refusing to come out." Liebich had contact with the firemen who told him the gas leak was from the stove. One of the neighbors from an adjoining home had called and reported the gas leak. Liebich went into the residence "with the intention of checking on the stove." Liebich looked at the stove and asked the firemen if it was damaged. Liebich checked the stove, looking for "any damage or any intentional way of causing gas to leak."[2] After seeing nothing, Liebich turned around and noticed the padlocked cabinet which he did not notice when he first went into the kitchen to check on the stove. One of the cabinet doors was slightly ajar, "about an inch." Without manipulating the cabinet, Liebich was able to see inside the cabinet. Liebich had been a police officer for 21 years and recognized cannabis in the cabinet. Liebich explained that defendant's exhibit No. 2 is a straight-on view of the cabinet and is not in the "slightly ajar" position that it was in when he first looked into it. While Liebich was inside the residence, there were also firemen inside. One was at the front door, and one was "near the slider that's connected to the kitchen." Liebich testified that, from the time he entered the residence until the time he "observed the padlock," less than a "minute or two" had passed. Liebich testified that he was inside the residence for "10 to 15 minutes" from the time he "entered the residence" to the time that he and Officer Stanish "ended up leaving" with defendant.

¶ 13     On re-direct, Liebich testified that defendant was the only nonemergency individual in the residence that day. After assessing the stove, Liebich was leaving to "go find" his partner when he noticed the padlocked cabinet.

_____

[2]Defendant's exhibit No. 2 shows the stove having been pulled away from the wall.

¶ 14    Defendant next called Roselle Officer Kyle Stanish. Stanish testified that, "mid-morning" of October 19, 2017, he was dispatched to 561 East Forum Drive in Roselle to assist "the fire department with a possible gas leak." The fire department was on scene and had determined the source of the leak, the stove. Stanish was not "100%" sure that the source had been shut off. Stanish was told by one of the paramedics "that there was a gentleman inside refusing to come out of the residence." The paramedics "felt it was necessary for him to come out and be evaluated since he had been breathing in gas all evening." The firemen told Stanish that the gentleman was lying down in a bedroom. To the best of Stanish's knowledge, the man, Casey Hagestedt, was the resident of that address. Stanish identified defendant in open court. While Stanish was in the bedroom speaking to defendant, Officer Liebich called for him to come out to the kitchen. Liebich told Stanish that there was cannabis in one of the kitchen cabinets. The cabinet doors were slightly ajar, "[a]bout an inch to two inches." Stanish pulled on the doors which opened the cabinet another "inch or two," which allowed Stanish to see a plastic container with what he thought to be cannabis. Stanish then went back to the bedroom to speak to defendant. Stanish asked defendant about the "contents of the cabinet and he denied all knowledge." Stanish again asked defendant to come outside, and defendant agreed. Stanish contacted his supervisor to "run by him" what he and Liebich had "observed." The supervisor contacted someone at the State's Attorney's Office and they determined that a search warrant for the residence should be obtained. After it was determined that a search warrant was necessary, the officers "determined to detain Mr. Hagestedt and bring him back to the police department." Stanish was present during the execution of the search warrant. The search warrant was based on what Stanish and Officer Liebich had reported seeing in that cabinet. The State objected to the defense questions regarding the execution of the search warrant as being irrelevant to the issue raised in defendant's motion. The trial court overruled the objection.

It was "only after the search warrant" that the items in the cabinet were seized. The officers did not seize the items upon initial observation because they "weren't going to go into the locked cabinet without a warrant."

¶ 15    On cross-examination, Stanish testified that he was told that "there was a health concern due to the defendant possibly inhaling gas all night" because it was unknown how long the gas had been leaking. Stanish arrived on the scene at about 8:00 a.m. Stanish identified State's exhibits 1 through 5 and described what is depicted in the photos. State's exhibit number 5 is a photo of the bedroom where defendant was located when he was refusing to come outside. Defendant was lying on the mattress, which was on the floor. He was covered with a blanket and said "it was cold." Defendant was calm. Stanish told him he wanted defendant to "go outside due to a health concern for him inhaling gas all night." Defendant "said he felt fine and he said he didn't want to go out." Stanish testified that his initial interaction with defendant was "maybe two minutes" before he was "called by Officer Liebich to go to the kitchen."

¶ 16    On cross-examination, Stanish testified that, in order to look into the cabinet without pulling it open as he did, you would have to "take more of a side angle" to observe what was inside. In addition to the cannabis, Stanish also saw syringes, which he determined to be "drug paraphernalia." Stanish also noticed that there was a "camera in the kitchen too that was pointed at that cabinet." Defendant counsel objected to this testimony as being beyond the scope of direct which the trial court overruled. The camera was on top of the refrigerator pointed directly at the padlocked cabinet. Stanish had "never really seen people videotape their kitchen cabinets." Stanish was inside the residence for a total of "approximately ten minutes" before leaving with defendant. Stanish went back into the residence a second time after it had been ventilated and he could smell a strong odor of cannabis.

¶ 17 On re-direct examination, Stanish acknowledged that the only reason he was dispatched to the defendant's residence was because "the fire department need[ed] assistance for evacuation for a gas smell." There was "no other information regarding any sort of criminal activity."

¶ 18 The trial court asked Stanish what was his purpose in going into the kitchen. Stanish testified that his "purpose originally was to talk with Mr. Hagestedt and try to get him to come outside to talk to the paramedics." While he was speaking to defendant, Officer Liebich called him to the kitchen and Liebich told him he had seen cannabis in one of the cabinets. He went to the kitchen because Liebich called him not for "anything related to the gas." Stanish testified that, prior to moving the cabinet doors another one or two inches, he could not see inside because he was "on the side furthest from the opening." He testified that pulling on the doors was "kind of a knee jerk reaction."

¶ 19 Defendant's exhibits 1 and 2 were admitted into evidence. The State moved, without argument, for a directed finding which the trial court denied "based on the nature of the evidence presented thus far." The State decided not to call any further witnesses and moved for the admission of the five exhibits identified by Officers Liebich and Stanish which were admitted into evidence without objection.

¶ 20 Citing *Lewis*, 363 Ill. App. 3d 516, defense counsel conceded that "the police had the ability to gain entry into the home that day under the Community Caretaking Doctrine." The defense argued that the "need to respond to an emergency does not give the police a general warrant to search whatever they want. The intrusion must be strictly circumcised [*sic*] to the exigency which justifies its initiation." Counsel argued that Officer Liebich went to the kitchen to observe the stove and that "there was nothing wrong. There was no more ongoing emergency" and it was only when he was leaving the kitchen that he saw the "padlocked cabinet. And to the officer, that's suspicious.

So what does he do? He looks inside that cabinet, and he can't really get a good look into it, so he uses his flashlight. They are rummaging around and searching without justification." Counsel argued that Officer Liebich "states that the cabinet is open less than an inch, but he's able to see within it, only when using a flashlight. So it's not plain view. He had to use a flashlight to see it." Counsel argued that the second officer, Stanish, had to open the cabinet "a little more to see inside[;] *** clearly the officers know that this is not in plain view and they could not legally seize that evidence." Counsel argued that, "if this was in plain view, the officers would have seized that evidence," but instead "they get a search warrant," noting that Stanish said that he was "not going into a locked cabinet without a warrant." The trial court asked whether it would be different if the items were in open view "on the actual counter of the kitchen and the flashlight was used to illuminate them?" Counsel answered, "that's an interesting different fact, but I do think that something out on a table is going to be comparatively different because clearly it's sitting on a table for officers to kind of see." The trial court then asked if counsel had "any case law that you're aware of that says the use of a lighting device somehow vitiates or negates plain view?" Counsel responded, "I don't have any case law on that," but "the totality of the circumstances in this case." Counsel argued that the padlocked cabinet was "an inch ajar" and the officer "didn't notice that until he was exiting that kitchen and then he uses a flashlight. I don't think he would have done—would have had a good view in that cabinet to know that was in that cabinet without that flashlight. So I think that's the key of why the flashlight is important here, because he wouldn't have had a view of that cabinet without that flashlight."

¶ 21    The trial court then asked defense counsel whether assuming the "observation of the contents of the cabinet was illegal *** we also have evidence that there's an odor of cannabis that the officer observes and we don't have the search warrant to know whether there's other things in

that search warrant that may also provide probable cause independent of the contents of the cabinet?" Counsel responded, "that could ultimately end up being a second motion" and also that "I don't think the smell of cannabis is enough for a search of a home as compared to an automobile."

¶ 22    The State argued that, given the "totality of the circumstances known to both officers on that day," their search of the cabinet was justified. The State argued that Officer Liebich's presence in the kitchen was justified under the "community caretaking exception," and "if you decline to find it falls under the community caretaking exception," look at the "emergency assistance exception" under *Lewis*. The State argued that the two-part analysis under *Lewis* was met in this case "first whether there are reasonable grounds to believe there is an emergency; and second, whether there is a reasonable basis to associate the emergency with the area looked [*sic*]." Citing *Brigham City v. Stewart*, the State cited examples where the United States Supreme Court has upheld warrantless entries into private property i.e. "fighting a fire, investigating its cause, preventing imminent destruction of evidence." The State distinguished *Humphrey* because in that case the incriminating character of the evidence was not immediately apparent. Here, the State argued, both officers observed cannabis and drug paraphernalia (syringes) so the plain view exception applied. The State argued there was "nothing wrong" with taking additional steps to get a search warrant. The State also noted that, after the home had been ventilated, "they observe an odor of cannabis." The trial court then asked if it would have been different "if that officer had to climb onto the countertop and then shine a light into the corner on top of the cabinets in the far corner of the Stove? Would that be a different circumstance and beyond the emergency caretaking exception and the emergency purpose exception?" The State compared what Liebich did to a field test on drugs. The officer "sees what he believes to be a green leafy substance. He takes a flashlight

out, confirms it to be the green leafy substance which is known to be weed." The State argued that the trial court's hypothetical "is more of an intrusion" than "simply turning around, exiting the kitchen and sees in plain sight in their view."

¶ 23    The trial court asked the State how could it "evaluate whether certain things ultimately led or justified the search warrant itself" if there was "no indication of what's in the search warrant?" The State responded that knowing what is in the search warrant was not necessary because "the issue here is whether or not the initial search into the cabinet, finding the drug paraphernalia was reasonable." The State suggested that any concerns about the search warrant would be a "separate motion that would be for a motion to quash that search warrant."

¶ 24    The trial court took the case under advisement for three weeks in order to "look a little more at the case law." The trial court ruled as follows:

"As an initial threshold matter, the Court heard evidence from the two officers, Officer Liebich and Officer Stanish. The Court gives credit to Officer Liebich's testimony in particular regarding the testimony relating to his presence in the apartment, his presence in the kitchen, and then his observation through the use of the flashlight in the course of being in the kitchen relating to the gas leak, his use of the flashlight to observe what was behind one of the cabinets that was ajar an inch or two, his observation of what he believed to be a green leafy substance packaged in individual packages, and then his observation of what he believed to be a syringe. The Court gives credit to that testimony.

Officer Stanish then also testified similar to Officer Liebich but his testimony involved what he termed as just kind of a reaction to the cabinet, by moving the cabinet first before observing what he observed.

The Court certainly understands that testimony, but I do find that that—the moving of the cabinet at that point is beyond the emergency exception doctrine, that does not come within the doctrine, it's outside of the scope of that doctrine, and would not be an authorized search.

So I don't—although I give credit to Officer Stanish's testimony and I find him to be credible, the Court does find that that particular observation would not be consistent with the [Fourth] Amendment doctrine of the emergency caretaking exception or the emergency exception to the community caretaking doctrine.

There was also testimony of Officer Stanish that related to an odor of cannabis when he went into the apartment the second time. I didn't hear really any circumstances as to why he went into it a second time. I can certainly understand why that would occur, but that testimony was also provided.

The Court did not have the benefit of the search warrant here, so I don't know what was in the search warrant, and there was testimony by Officer Stanish that the search warrant was based on the observations of the officers, Officer Liebich and Officer Stanish, but that's somewhat of a general statement and I don't know if there was more information or that was the only basis of the search warrant.

There was no testimony that it was—that exclusively certain pieces of information that were in the search warrant and other pieces of information were excluded. I don't know, for example, whether the second observation of Officer Stanish regarding the cabinet was in the search warrant. I just don't know. And, ultimately, the items that are the subject of the motion here are the items that were obtained pursuant to the search warrant. There was testimony regarding that.

So it's difficult for the Court without the search warrant to find that the search warrant was somehow based upon improper evidence. There was no testimony as to the seeking of the search warrant, who sought the search warrant and the reasons for the search warrant, the reasons for the request for the search warrant, whether or not it would have been requested based upon certain observations or not based upon certain observations. I don't have the benefit of that testimony.

What the Court does have is that there was a legitimate observation by Officer Liebich into the cabinet. There was also, the Court finds, an observation of Officer Liebich, an odor of cannabis—excuse me, of Officer Stanish of an odor of cannabis in the residence, and then there was testimony that a search warrant was sought.

Without any more information about the search warrant or the circumstances surrounding the issuance of the search warrant, the Court cannot find that that search warrant is somehow invalid under the [Fourth] Amendment.

The Court finds that these observations that the Court has already indicated were either under the emergency exception to the community caretaking exception or otherwise authorized, and coupled with the fact that a search warrant was obtained, the Court will find that there is no violation of the [Fourth] Amendment based upon the items being collected or seized pursuant to the search warrant that then issued.

So, for those reasons, the Court will respectfully deny the motion to suppress.

MS. SROKA [(ASSISTANT PUBLIC DEFENDER)]: Your Honor, may I ask for some clarification?

THE COURT: Certainly.

MS. SROKA: Especially since I do plan on filing subsequent motions.

Is the Court's ruling that Officer Liebich's use of the flashlight to observe the contents of the cabinet within [sic] the [Fourth] Amendment?

THE COURT: And that's a fair inquiry. I should make the comment upon that.

The Court finds that the use of a flashlight does not in any way make that—make the visual observation of Officer Liebich somehow invalid under the [Fourth] Amendment.

Put another way, the use of a flashlight to illuminate an area around an officer, I don't find that that would somehow render those observations invalid under the [Fourth] Amendment.

In particular, in this instance, the use of the flashlight under these circumstances is reasonable in light of the emergency nature of what is occurring and the like, so I do not find that the use of the flashlight in any way transforms the visual observations of the officer to be an invalid search under the [Fourth] Amendment."

Defense counsel then inquired whether Officer Stanish's "opening of the cabinet" would be suppressed and the trial court said it would not be admissible "in any subsequent proceeding" because "the moving of the cabinet by Officer Stanish would be outside the emergency exception to the community caretaking exception under the 4th Amendment."

¶ 25 Defendant filed a motion to reconsider the trial court's denial of his motion to suppress evidence. Defendant's motion stated that the court "ruled that Officer Liebich's observations of possible marijuana within the cabinet did fall within the emergency assistance exception to the Fourth Amendment." Defendant stated that there is a two-step test to determine whether the emergency exception applies. "First, there must be reasonable grounds to believe there is an emergency. Second, 'the police must have some reasonable basis,' approximating probable cause 'associating with the areas to be searched.' " (quoting *People v. Lomax*, 2012 IL App (1st) 103016,

¶ 29; see also *People v. Lewis*, 363 Ill. App. 3d 516, 526 (2006) (stating that "an emergency-assistance search does not require a type of individualized suspicion")). Defendant conceded that the first step, reasonable grounds to believe there is an emergency, was met. Defendant argued that, by Liebich's own testimony, the "emergency" had ended when he was on the way out of the kitchen and paused to look into the cabinet, "therefore there was no reason for Officer Liebich to look into the cabinet with a flashlight." Defendant maintained that there was "no individualized suspicion" for Liebich to look into the "padlocked cabinet" that was associated with the emergency. Therefore, the emergency assistance exception does not apply to Office Liebich's *search* of the cabinet." (Emphasis added.)

¶ 26    During the hearing on defendant's motion to reconsider, defense counsel argued that "because the emergency had ceased to exist" at the time Liebich looked into the cabinet, the "search of the cabinet was not—was in violation of the 4th Amendment."

¶ 27    The State argued that "simply looking and using your flashlight to look, the State does not believe it goes outside that emergency exception and goes more within the totality of the circumstances in this case."

¶ 28    The trial court found that "Officer Liebich was properly present in the kitchen pursuant to the emergency, based upon the nature of the emergency, the gas being in the apartment presenting a dangerous circumstance." The court also noted that, while it was true that the fire department might have addressed the gas source, "it is certainly not unreasonable for another emergency personnel to investigate that source and ensure that the gas is no longer leaking." The court repeated its prior ruling that "what occurred here is essentially a plain view observation. The use of the flashlight into the cabinet, in the Court's mind, is not a search." The court noted that, "without physical movement of the cabinet," Liebich's conduct "falls within the plain view

exception—plain view doctrine" of the Fourth Amendment. The court denied defendant's motion to reconsider.

¶ 29                                    C. Stipulated Bench Trial

¶ 30    On September 20, 2021, defendant entered partially negotiated pleas to a number of felonies. In the instant case the parties agreed to conduct a stipulated bench trial so that defendant could preserve his right to appeal the denial of his motion to suppress evidence. The State *nolle prossed* counts two and three and proceeded on count one. The State provided a factual basis. In the factual basis, the State informed the trial court that, in a recorded interview, defendant told Detective Gates that he did have access to the cabinet where the controlled substances were recovered; that the baggies containing the "residue" were his; and that "he had previously used heroin earlier that day on October 19th of 2017." The trial court asked if defendant was a resident and the State responded that defendant told the officers "that it was his cousin's residence, but he had been living there for a few days." Defense counsel stipulated that, if called, the state's witnesses would so testify. The trial court[3] found defendant guilty of unlawful possession of a controlled substance. The trial court sentenced defendant to 30 months' probation, 180 days in jail with credit for 126 days, fines, costs and fees. Defendant timely appealed.

¶ 31                                    II. ANALYSIS

¶ 32    On appeal, defendant argues that the trial court erred in denying his motion to suppress evidence because "[t]he actions of Officer Liebich clearly exceeded the scope of the community caretaking exception that afforded him warrantless entry into Mr. Hagestedt's home. Further, looking into the clearly locked cabinet was a search prohibited by the Fourth Amendment because

---

[3]Judge Ann Celine O'Hallaren Walsh presided over the trial, having replaced Judge Alex McGimpsey, who presided over the motion to suppress.

its contents cannot be said to have been in plain view." In response to defendant's arguments, the State argues that the trial court properly found that Office Liebich was legally present in the kitchen of defendant's residence based on the emergency nature of the situation when he made a plain-view observation of the cannabis and syringes and the use of the flashlight did not transform the plain-view observation into a search.

¶ 33    The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. Similarly, the Illinois Constitution provides that the "people shall have the right to be secure in their persons, houses, paper and other possessions against unreasonable searches [and] seizures." Ill. Const. 1970, art. 1 § 6.; *People v. Pitman*, 211 Ill. 2d 502, 513 (2004). "Illinois courts have interpreted the search and seizure provision in the Illinois Constitution consistently with the fourth amendment jurisprudence of the United States Supreme Court." *People v. Martin*, 2017 IL App (1st) 143255, ¶ 17 (2017).

¶ 34    In reviewing a trial court's ruling on a motion to suppress evidence, we apply the two-part standard of review adopted by the Supreme Court in *Ornelas v. United States*, 517 U.S. 690, 699 (1996); *People v. Johnson*, 237 Ill. 2d 81, 88 (2010). Under this standard, we defer to the trial court's findings of fact and will reject those findings only if they are against the manifest weight of the evidence. *Id.* We remain free, however, to undertake our "own assessment of the facts in relation to the issues." *Id.* We review *de novo* the trial court's ultimate legal ruling as to whether suppression is warranted. *Id.* (citing *People v. Cosby*, 231 Ill. 2d 262, 271 (2008) (quoting *People v. Luedemann*, 222 Ill. 2d 530, 542-43 (2006))). Defendant has the burden of producing evidence and proving that there was a search, and that the search and seizure were illegal. *People v. Brooks*, 2017 IL. 121413, ¶ 22. "A defendant must make a *prima facie* case that the evidence was obtained

by an illegal search or seizure." *People v. Gipson*, 203 Ill. 2d 298, 307 (2003). If a defendant's evidence makes a *prima facie* case, the State has the burden of going forward with evidence to counter the defendant's *prima facie* case. "However the ultimate burden of proof remains with the defendant." *Id.*

¶ 35    Throughout his opening brief, defendant claims that Officer Liebich spent "between nine and fourteen minutes" looking at or inside the cabinet before he called Officer Stanish to look into the cabinet as well. The State correctly responds that the record does not support defendant's version of the facts. Officer Liebich testified that he made the observation of the cannabis and syringes inside the cabinet within a "minute or two" of entering the town home. Officer Stanish testified that Liebich called for him about two minutes after Stanish entered defendant's bedroom.

¶ 36    In his reply brief, defendant argues that "the State is confusing the time it took Liebich to secure the stove and initially search the cabinet (one to two minutes after entering the house) with the total mount [*sic*] of time he spent [*sic*] the kitchen conducting his criminal investigation." Defendant argues that there is no evidence that Liebich "went anywhere in the house besides the kitchen the entire time he was there." We disagree. Liebich testified the total time he spent in the residence was "ten to fifteen" minutes. Liebich, Stanish, and defendant all left the residence together, once defendant agreed to leave. It is reasonable to infer that, after Stanish went back to the bedroom to speak with defendant, Liebich went with him.

¶ 37    Defendant also argues that, "[o]nce Stanish was called away from Casey's bedside, all police attention to the ongoing emergency ceased and the remainder of the 9-15 minutes the officers were in the home was devoted solely to their criminal investigation." There is no support for this contention in the record and defendant does not provide a citation from the record that purports to support it. Illinois Supreme Court Rule 341(h)(6) (eff. Oct. 1, 2020) requires "the facts

necessary to an understanding of the case" be stated "accurately and fairly without argument or comment, and with appropriate references to the pages of the record on appeal." Contrary to defendant's argument, the record shows that the officers did not spend their time deciding what steps would be taken regarding the cabinet until after they talked defendant into leaving so he could be checked out by the paramedics.

¶ 38 Defendant argues that "because Officer Liebich's investigation of the cabinet was not within the scope and purpose of his role as a community caretaker or emergency responder, all of the evidence subsequently found in the case must be suppressed, and Mr. Hagestedt's conviction must be reversed outright." Defendant points out that the trial court made reference to both the "community caretaking" and "emergency aid" exceptions to the Fourth Amendment's search warrant requirement.

¶ 39 In *People v. McDonough*, 239 Ill. 2d 260 (2010), our supreme court explained that "community caretaking refers to a capacity in which the police act when they are performing some task unrelated to the investigation of crime, such as helping children find their parents, mediating noise disputes, responding to calls about missing persons or sick neighbors, or helping inebriates find their way home." *Id.* at 269 (citing *Luedemann*, 222 Ill. 2d at 545-46).

¶ 40 In *Caniglia v. Strom*, 141 S. Ct. 1596 (2021), the Supreme Court made clear that the community caretaking doctrine does not create a "standalone doctrine that justifies warrantless searches and seizures in the home." 141 S. Ct. 1596, 1600 (2021). The Supreme Court also reaffirmed the principle that "officers may generally take actions that " 'any private citizen might do' without fear of liability." *Id.* at 1599. In *Caniglia*, the police were called by the wife of a man who had asked his wife to shoot him with a handgun he had placed on the dining room table. *Id.* at 1598. She left the home and stayed overnight in a hotel. *Id.* The next day, when her husband did

not answer the phone, the wife called the police and requested a welfare check. *Id.* The officers accompanied the wife to the home where they encountered the husband. *Id.* The husband denied that he was suicidal. *Id.* The officers asked the husband if he would agree to a psychiatric evaluation and he agreed (the husband agreed to go to the hospital only if the police "promised not to confiscate his firearms"). *Id.* The police "allegedly misinformed" the wife about her husband's wishes and the wife allowed the police to enter the home and seize two handguns. *Id.*

¶ 41 The Supreme Court noted that the First Circuit had "declined to consider whether any recognized exigent circumstances were present because respondents had forfeited the point. Nor did it find that respondents' actions were akin to what a private citizen might have had authority to do if petitioner's wife had approached a neighbor for assistance instead of the police." *Id.* at 1599.

¶ 42 Defendant in this case cites *Caniglia* for the proposition that "what is reasonable for vehicles is different from what is reasonable for homes." (quoting *Caniglia*, 141 S. Ct. at 1600). The issue in *Caniglia* was the warrantless entry, and the case did not involve the application of the plain view doctrine. The concurring justices (Roberts, Breyer, Alito, and Kavanaugh) made clear that the court was not disturbing other exceptions to the warrant requirement. *Id.* at 1600-1605. At oral argument, defendant conceded that Officer Liebich was lawfully present in the kitchen when he looked into the cabinet and that an ordinary guest in the home could have looked into the cabinet because it looked suspicious.

¶ 43 The "emergency aid" exception to the search warrant requirement allows police to enter a residence if (1) they have reasonable grounds to believe that an emergency is at hand and that their immediate aid is necessary to assist in the protection of life or property, and (2) there is some

reasonable basis for connecting that emergency with the residence. *People v. Aljohani*, 2022 IL 127037, ¶¶ 43-47.

¶ 44    Defendant concedes that Officer Liebich was legally present in the kitchen when he looked into the locked cabinet. Liebich was not aware of the fact that defendant was inside the residence until Stanish came into the kitchen. Liebich's entry into the residence was permissible under the emergency aid exception. For all practical purposes Officer Liebich completed his task by making sure the gas was off.

¶ 45    Over eighty years of Supreme Court jurisprudence confirms that use of artificial illumination to view objects does not constitute a search under the Fourth Amendment. Search and Seizure: A Treatise on the Fourth Amendment, sec. 2.2(b) (2022 Update) (citing *United States v. Lee,* 274 U.S. 559 (1927)). In *United States v. Dunn*, the Supreme Court held that the use of a flashlight to look through an open barn door "did not transform their observations into an unreasonable search within the meaning of the Fourth Amendment." 480 U.S. 294, 305 (1987). The use of a flashlight to look into an open container inside a lawfully stopped car is not a search. *People v. Hampton*, 307 Ill. App. 3d 464 (1999); *Texas v. Brown*, 460 U.S. 730 (1983); *Leudemann*, 222 Ill. 2d at 561. It is equally well settled that seizure of property in plain view inside a home "involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity." *Payton v. New York*, 445 U.S. 573, 587 (1980). Defendant has not provided any authority for the proposition that Liebich's use of the flashlight transformed a plain view observation into a search. As such, the argument is forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1., 2020); *In re Addison R.*, 2013 IL App (2d) 121318, ¶ 31.

¶ 46    During argument on the motion to suppress, defendant conceded that the condition of the cabinet looked "suspicious" and Officer Liebich "can't really get a good look into it, so he uses his flashlight." Counsel argued that, because Liebich could "see within it, only when using a flashlight. So it's not plain view." During argument on defendant's motion to reconsider, defense counsel argued that, based on "*People v. Lomax*, 2012 Ill. App. (1st) 103016, the defense contends that this is not within the emergency exception of this kind of search, because there was no approximating—the looking at the cabinet was not associated with the emergency because the emergency had ceased to exist at that time." *Lomax* does not support defendant's argument. In *Lomax*, the police responded to a 911 call from citizens claiming that gunshots were heard coming from a "two flat multiunit" apartment building. *Id.* ¶ 5. Once they located the suspected apartment, the police had the occupants exit the apartment so that they could perform a "visual safety check" to ensure that no one had been shot. *Id.* ¶¶ 6-7. While going through one of the bedrooms, the police observed "body armor, a pistol holster, pistol belt, and pistol ammunition," as well as a pistol in one of the other rooms. *Id.* ¶ 8. Four spent shell casings were observed on the ground outside the apartment. *Id.* The trial court granted the defendant's motion to suppress, finding that the "police officers searched through drawers and crawl spaces at defendant's apartment and that the police had no reason to select defendant's apartment as the source of the gunshots." *Id.* ¶ 21.

¶ 47    On appeal, the appellate court in *Lomax* reversed the trial court's order suppressing the evidence, holding that the trial court's factual findings were against the manifest weight of the evidence, stating that "nothing in the record suggests that the police officers did anything more than perform a plain view safety search. There is no evidence in the record that the police opened up any drawers or crawl spaces." *Id.* ¶ 23. The trial court's finding regarding which apartment the

call of service was directed could not be reconciled with the trial court's earlier statement that "Officer Thomas testified that at least one call directed them to defendant's apartment." *Id.* ¶ 22.

¶ 48    In *Aljohani*, our supreme court adopted the two-part test under the "emergency aid doctrine" discussed in *Lomax*. 2022 IL 127037, ¶ 49. In his opening brief, defendant acknowledges the two-part test for the emergency aid exception discussed in *Aljohani*:

> "First, the police must have 'reasonable grounds' to believe there is an emergency at hand; and second, the police must have some reasonable basis, 'approximating probable cause,' associating the emergency with *the area to be searched or entered*. [Citation.] The reasonableness of the officers' beliefs as to the existence of an emergency is determined by the totality of the circumstances known to the officer at the time of entry. [Citation.] The United States Supreme Court has held that emergency situations include instances when someone may be injured or threatened with injury." (Emphasis added.) *Id.* ¶ 43 (quoting *Lomax*, 2012 IL App (1st) 103016, ¶ 43).

¶ 49    In his brief, defendant omits the words, "or entered," which is a crucial component of the plain view doctrine. The Supreme Court has repeatedly held that "law enforcement officers may seize evidence in plain view, provided that they have not violated the Fourth Amendment in arriving at the spot from which the observation of the evidence is made." *Kentucky v. King*, 563 U.S. 452, 462-63 (2011) (citing *Horton v. California*, 496 U.S. 128, 136-140 (1990)). As the Supreme Court noted, "[s]o long as this prerequisite is satisfied, however, it does not matter that the officer who makes the observation may have gone to the spot from which the evidence was seen with the hope of being able to view and seize the evidence." *Id.* at 463. "The fact that an officer is interested in an item of evidence and lawfully expects to find it in the course of a search should not invalidate its seizure." *Id.* (quoting *Horton*, 496 U.S. at 138). "The Fourth Amendment

requires only that the steps preceding the seizure be lawful." *Id.* An officer's motives are irrelevant, "outside limited contexts such as 'inventory search or administrative inspection.' " *Id.* at 464.

¶ 50 It is beyond dispute that a police officer's community caretaking duties do not justify warrantless searches and seizures in the home. *Caniglia*, 141 S. Ct. 1596 (2021). The Supreme Court emphasized that "law enforcement officers may enter private property without a warrant when certain exigent circumstances exist, including the need to 'render emergency assistance to an injured occupant or to protect an occupant from imminent injury.' " *Id.* at 1599 (quoting *Kentucky v. King*, 563 U.S. 452, 460, (2011). "And of course, officers may generally take actions that 'any private citizen might do' without fear of liability." *Id.* (quoting *Florida v. Jardines*, 569 U.S. 1, 8 (2013). "A warrant to enter a home is not required *** when there is a 'need to assist persons who are seriously injured or threatened with such injury.' " *Id.* at 1600 (Roberts, J. and Breyer, J., concurring) (quoting *Brigham*, 547 U.S. at 406). As Justice Kavanaugh explained in his concurrence, "the community caretaking doctrine was primarily devised for search of cars, not homes." *Id.* at 1603 (Kavanaugh, J., concurring). Justice Kavanaugh explains that "the exigent circumstances doctrine allows officers to enter a home without a warrant in certain situations, including to fight a fire and investigate its cause *** or to protect an occupant who is threatened with serious injury." *Id.* In this case, as defendant concedes, it is clear that the officers were legally justified in entering defendant's home under either the community caretaking exception or the emergency exception, to prevent injury to defendant and to investigate the source of the gas leak. The only issue is whether Officer Liebich violated the Fourth Amendment by looking into the cabinet with the time.

¶ 51 In his motion to suppress, defendant maintained that, "since the actions of the officers, in entering the kitchen and looking into the kitchen cabinets, excluded any exception to the

requirement for a warrant, those actions constituted an impermissible search of the Defendant's home." In his opening brief, defendant argues that "this court's holding in *People v. Mikrut*, 371 Ill. App. 3d 1148 (2007) is both controlling and instructive." We disagree. In *Mikrut*, a woman named Phillips, who had been staying in Mikrut's home, called police for assistance in retrieving her belongings from Mikrut's home. *Id.* at 1149. Phillips referred to Mikrut as her "boyfriend" and said she was afraid of him. *Id.* She also told police that Mikrut owned "a rifle and a pistol." *Id.* The police determined that Mikrut did not have a valid firearms owner's identification card. *Id.* Three police officers accompanied Phillips to Mikrut's house. *Id.* When police arrived, Mikrut objected to the police presence in his home and "became irate and continuously questioned why the police were at his home." *Id.* While Mikrut was in his living room, along with two armed police officers, a third officer accompanied Phillips into the bedroom to collect her belongings. *Id.* When the woman opened the closet door, the officer saw a rifle. *Id.* The rifle was seized. *Id.* Mikrut then showed the police where the pistol was located and he was then arrested. *Id.* at 1149-50. The police officers testified that they did not go to the home "to look for weapons and their only purpose was to assist Phillips." *Id.* at 1150. The trial court initially denied the defendant's motion to suppress, but on reconsideration, granted the motion because Mikrut objected to the police presence and also because, when he "was secured in the living room, there was no real need for the officers to accompany Phillips to the bedroom." *Id.*

¶ 52 On appeal, this court affirmed the trial court's order suppressing the evidence. *Id.* at 1153. We cited *Georgia v. Randolph*, 547 U.S. 103, 120 (2006) for the proposition that "defendant's express refusal of consent to a police search is dispositive as to that person, regardless of the consent of a fellow occupant." *Id.* at 1151. We also rejected the State's argument that the police "were acting in a 'community caretaking function,' and seized items found in plain view." *Id.* at

1152. We agreed that the police were "justified in doing what was necessary to prevent violence between Mikrut and Phillips." *Id.* at 1153. However, we held that "this did not give the police a general warrant to intrude wherever they wanted." *Id.* "Once Mikrut was secured in the living room, any further *entry* by the officers was unreasonable for fourth amendment analysis because any further intrusion was unnecessary." (Emphasis added.) *Id.* Because the officer's presence in the bedroom "was unreasonable," the Fourth Amendment violation "invalidated the discovery of the rifle in the closet and the later discovery of the pistol." In this case, defendant concedes that Officer Liebich's presence in the kitchen was justified under either the community caretaking or emergency exception to the warrant requirement. He argues, however, that Liebich "searched an area that was not related to his role as a community caretaker." Defendant cites no authority for his argument that Liebich's actions constituted a search. He also cites no authority for the proposition that, because looking into the cabinet was "unrelated" to his "role as a community caretaker," Liebich violated the Fourth Amendment. To the extent defendant relies on *Mikrut*, we reject his argument. Unlike in *Mikrut*, Liebich was authorized to be in the kitchen and defendant concedes that a private citizen guest in the home could have looked into the cabinet with a flashlight and made the same observation as Liebich. We also note that there was no testimony that Liebich objected to the police presence, unlike in *Mikrut*.

¶ 53    In *Arizona v. Hicks*, the Supreme Court rejected the argument that, because an officer's action directed to an object was unrelated to the justification for the entry into the defendant's apartment, "it was *ipso facto* unreasonable." 480 U.S. 321, 325 (1987). "That lack of relationship always exists with regard to action validated under the 'plain view' doctrine, where action is taken for the purpose of justifying the entry, invocation of the doctrine is superfluous." *Id.* at 325. The Supreme Court also explained that the language in *Mincey v. Arizona* "saying that a warrantless

search must be 'strictly circumscribed by the exigencies which justify its initiation,' " was addressing only the scope of the primary search itself, and not overruling by implication the many cases acknowledging that the 'plain view' doctrine can legitimate action beyond that scope." *Id.* at 326 (quoting *Mincey v. Arizona*, 437 U.S. 385, 393 (1978)).

¶ 54    The Supreme Court has repeatedly held that, so long as a police officer does not violate the Fourth Amendment in arriving at the place from which the evidence or contraband could be plainly viewed, "it does not matter that the officer who makes the observation may have done to the spot from which the evidence was seen with the hope of being able to view and seize evidence." *Kentucky v. King*, 563 U.S. 452, 463 (2011).

¶ 55    During the hearing on defendant's motion to suppress, defendant never asked Officer Liebich why he looked into the cabinet. Defendant argued that Liebich looked into it because it "looked suspicious." Liebich's motives are irrelevant. The Supreme Court has repeatedly "rejected a 'subjective approach,' asking only whether 'the circumstances viewed objectively, justify the action.' " *Id.* at 464 (quoting *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404 (2006)).

¶ 56    Defendant argues that, by locking the cabinet, he expressed his interest in privacy and that the cabinet was ajar through "no fault of his own." "The rationale of the plain view doctrine is that if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no 'search' within the meaning of the Fourth Amendment—or at least no search independent of the initial intrusion that gave the officers their vantage point." *Minnesota v. Dickenson*, 508 U.S. 366, 375 (1993).

¶ 57    In his brief, defendant cites a law review article for the proposition that "the primary issue with the community caretaking exception lies in balancing the police's public assistance function with ensuring that officers do not 'search or seize whenever they might be pursuing community-

caretaking goals.' " *Police Paternalism: Community Caretaking, Assistance Searches and Fourth Amendment Reasonableness*, 66 Wash & Lee L. Rev. 1485, 1562-63 (2009). The quoted language is from the article's conclusion. *Id.* In the preceding paragraphs, the author states:

"Most pertinent to the community-caretaking cases, the Supreme Court has stated in dictum that police may enter a home without a warrant to ensure the safety of an abuse victim, '[a]nd since the police would then be lawfully in the premises, there is no question that they could seize any evidence that is in plain view or take further action supported by any consequent probable cause.' Even more directly, the Court has stated that 'the police may seize any evidence that is in plain view during the course of their legitimate emergency activities.' Accordingly, the Fourth Amendment does not require the exclusion of evidence if police have acted reasonably, even if doing so would provide a powerful prophylactic deterrent for Fourth Amendment violations." *Id.*

¶ 58    After *Caniglia*, "the community caretaking doctrine does not apply to searches of residences." *People v. Kolesnikov*, 2022 WL 1951607. In *Kolesnikov*, this court had previously upheld a seizure of cannabis plants in plain view inside the defendant's basement, where the police entry into the premises was authorized under the community caretaking doctrine. *Id.* ¶ 1. Subsequent to our decision, the Supreme Court issued its decision in *Caniglia*. Our supreme court, in the exercise of its supervisory authority, directed us to vacate our earlier judgment and reconsider in light of *Caniglia*. We again affirmed, holding that the officers' entry into defendant's residence was "reasonable and authorized in accordance with the emergency exception to the warrant requirement." *Id.* ¶ 37.

¶ 59    In *Kolesnikov*, police responded to a call from defendant's ex-girlfriend that he was suicidal. *Id.* ¶ 4. The defendant answered the door wearing a bathrobe with no shirt. *Id.* ¶ 6. He

appeared to be "intoxicated; slow, sluggish, groggy." *Id.* The defendant acknowledged knowing the complainant. *Id.* While speaking to the defendant, one of the officers received a text message containing a photo defendant had sent to his ex-girlfriend showing an image of the "crotch area" of a person "wearing jeans sitting in what appeared to be water, with a large knife on his lap." *Id.* ¶ 7. The defendant was shown the image and would not answer "yes or no" as to whether he had sent the image. *Id.* The defendant was not wearing jeans and did not appear to be wet. *Id.* The police escorted the defendant to the ambulance that had arrived and entered the defendant's townhome out of concern that someone inside might be injured and "to see if there was a person that's still sitting in a bathtub with a knife in their lap." *Id.* ¶ 8. While conducting a sweep of the townhome, one of the officers noticed a light shining through a partially open door in the basement. *Id.* When the officer opened the door, he "observed marijuana plants growing out of buckets." *Id.* We again upheld the trial court's order denying Kolesnikov's motion to suppress under the "emergency exception to the warrant requirement." *Id.* ¶ 37. "[T]he officers' entry into defendant's home was justified by the emergency exception, we further hold that they were entitled to be in defendant's residence when they observed cannabis plants in plaint view. *Id*.

¶ 60    Here, defendant concedes that there was an ongoing emergency when the police entered defendant's townhome and Officer Liebich's presence in the kitchen was justified. Again, defendant has not cited any precedent for the proposition that Liebich's actions in looking into the cabinet with his flashlight was a search. As such, his argument is forfeited.

¶ 61    Defendant argues that "the only way this court can hold that the contents of this cabinet were in plain view is to hold that a reasonable expectation of privacy includes the responsibility of constant maintenance and vigilance in an area one seeks to keep private so no gap, however

small forms." Defendant requests that we consider cases from foreign jurisdictions as persuasive because the question "has not been adequately addressed by Illinois courts."

¶ 62    Defendant first cites *State v. Tarantino*, 322 N.C. 386 (1998) in support of his argument that the contents of the cabinet were not in plain view. In that case, the trial court suppressed the evidence seized because the information furnished to establish probable cause was obtained in violation of the Fourth Amendment. *Id.* at 388. In that case, the police received an anonymous tip that marijuana was being grown in an old building which could be "observed by looking through cracks in the building's backwall." *Id.* at 387. The police knew the call would not be enough to establish probable cause, so a detective went to the building to investigate. *Id.* The detective began by knocking on the front door. *Id.* at 388. He then climbed the hill which the building was built into using his flashlight to guide him "along a little used patch." *Id.* The detective "entered the porch and knocked on one of the doors inside." *Id.* He then searched the back wall until he found cracks in the wall. "By maneuvering his body and shining his flashlight through cracks," the detective could see marijuana plants. *Id.* The Supreme Court of North Carolina distinguished *United States v. Dunn*, 480 U.S. 294 (1987), where the court held that the "officers' use of the beam of a flashlight, directed through the essentially open" barn door did not transform their observations into a search within the meaning of the Fourth Amendment. *Id.* at 395. The court noted that, "[t]o make his observations, Detective Baker had to bend and peer with a flashlight through quarter-inch cracks near the floor." *Id.* at 391. The court noted that "the cracks near the porch floor required him to make a probing examination in order to see inside." *Id.* The court concluded that, "because defendant did not expose the interior of his building to the public, the Fourth Amendment applied with full force." *Id.* at 392. In the instant case, the police were not conducting a criminal investigation. They were responding to an emergency. Defendant concedes

that the cabinet's chained and locked character looked suspicious and that, while defendant may not like it, a private citizen guest in the home could have looked into the cabinet with a flashlight. In his attempt to rely on *Tarantino*, defendant argues that "Liebich was only able to view its contents because of the lengthy efforts he employed to exploit a very minor structural flaw in the cabinet." Defendant characterized Liebich's actions as a "strained and contorted search." Defendant has mischaracterized the facts. Liebich was in the kitchen for two minutes or less before he called Officer Stanish. The cabinet was above the kitchen counter to the left of the sink. There was no testimony that Liebich had to "strain" or "contort" himself to make the observation.

¶ 63     Next, defendant cites *State v. Fortmeyer*, 178 Or. App. 485 (2001). In that case, the police went to the defendants' residence to perform a "knock and talk" in response to a tip that the defendants might be growing marijuana. *Id.* at 487. The police went to the next-door neighbor's residence and "obtained consent to enter a three-to four-foot wide common area adjacent to defendant's residence." *Id.* The police noticed a "basement window behind a door panel that had been leaned up against defendants' house." *Id.* There was a "little light from a crack in the window," which was at ground level and about "18 inches in height." *Id.* Except for a "two-by-six inch crack at the top of the window, it was covered on the inside by a piece of cardboard." *Id.* The officers testified that, by "kneeling down in a particular angle and turning their heads toward the basement window, they could see around the door panel and through the two-by-six inch crack." *Id.* Through an open doorway on the far wall of the basement, they could see what appeared to be marijuana plants. *Id.* at 488. The trial court denied the defendants' motion to suppress. *Id.* On appeal, the defendants argued that the "special efforts" employed by the officers to see inside the basement "constituted a search and violated defendants' right to privacy." *Id.* The Oregon court of appeals agreed with the defendants and reversed and remanded for a new trial. *Id.* at 492. The court

noted that, "[t]o find strangers, on their knees, attempting to peer through what appears to be a covered basement window, would be suspicious, uncommon, and unacceptable in our society." *Id.* The court cited *State v. Portrey*, 134 Or. App. 460, 465 (1995), for the proposition that "whether police engage in a search by examining items not 'entirely visible' depends, in part, on 'social and legal norms of behavior.' " *Id.* at 492. In his brief, defendant states that, in *Fortmeyer*, "[b]ecause of the outward expression of the defendants' privacy interests and the officers' actions needed to have a view into their residence, even though the officers were rightfully in the common area, the officers *conducted a search requiring Fourth Amendment protections.*" (Emphasis added.) (citing *Fortmeyer*, 178 Or. App. at 491 (citing *State v. Gabbard*, 129 Or. App. 122, 130 (1994))). *Fortmeyer*, *Portrey*, and *Gabbard* were all decided under the Article 1 sec. 9 of the Oregon Constitution. In fact, in *Fortmeyer*, the court noted that, "[b]ecause we resolve this case on state constitutional grounds, we do not consider the federal constitution." 178 Or. at 492.

> " 'Unlike under the federal constitution, a search [under Article I, section 9,] is not defined by a reasonable expectation of privacy, but in terms of 'the privacy to which one has a right.'' ' [Citation.]

> That right includes protection against practices by the government that 'significantly impair "the people's" freedom from scrutiny.' [Citation.] One indication of whether a government action intrudes on a person's privacy right is whether a private individual would offend social and legal norms of behavior by engaging in the same kind of intrusion." *Portrey*, 134 Or. App. at 464.

¶ 64    In Illinois, when applying the plain-view doctrine Illinois reviewing courts follow the Supreme Court of the United States precedent. See *People v. Jones*, 215 Ill. 2d 261, 271-72 (2005); *People v. McCavitt*, 2021 IL 125550, ¶ 111. We remind counsel to properly characterize

authorities cited in his briefs in the future. See Ill. R. Prof'l Conduct R. 3.3(a)(1) (eff. Jan. 1, 2010) ("A lawyer shall not knowingly *** make a false statement of fact or law to a tribunal").

¶ 65    In this case, the uncontested evidence shows that Officer Liebich was (1) lawfully in a position from which to view the objects seized, (2) the items incriminating character was immediately apparent, and (3) Liebich had a lawful right of access to the items.

¶ 66    Under the plain-view doctrine as articulated in *Horton*, 496 U.S. at 136-140, and *McCavitt*, 2021 IL 125550, ¶ 111, Liebich did not violate the Fourth Amendment when he looked with his flashlight into the cabinet. Defendant's argument throughout his brief that Liebich's movements to get a better view into the cabinet is not only refuted by the record, it is at odds with the holding of the Supreme Court in *Brown*.

> "[T]he use of artificial means to illuminate a darkened area simply does not constitute a search, and thus triggers no Fourth Amendment protection.
>
> Likewise, the fact that Maples 'changed [his] position' and 'bent down at an angle so [he] could see what was inside' Brown's car *** is irrelevant to Fourth Amendment analysis." 460 U.S. 730 at 740.

As in *Brown*, and as defendant concedes, a private citizen guest in defendant's home "could peer" into the interior of the cabinet by looking inside on an angle.

¶ 67    The dissent states that "[c]ommon sense and case law both clearly establish that Liebich performed a search." The dissent then quotes *Arizona v. Hicks*, 480 U.S. at 325 for the proposition that, by "taking action unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment on its contents," Officer Liebich performed a search.

¶ 99. Unlike in *Hicks*, however, Officer Liebich did not move anything in order to see into the cabinet.

¶ 68   The dissent takes issue with the fact that we accepted defendant's concession at oral argument that a private citizen guest in the home could have looked into the cabinet. "[O]ral argument can play an important part in an appeal because attorneys have, at times, conceded points during the argument that were not conceded in the written brief." *People v. Colyar*, 2013 IL 111835, ¶ 57 (quoting *Jackson v. Board of Election Commissioners*, 2012 IL 111928, ¶ 72). In *Colyar*, counsel conceded at oral argument that the police officers, "upon seeing bullet[,] could have been allowed to order occupants of a vehicle out of the vehicle and be subject to a pat-down search." Like in *Colyar*, defense counsel here conceded at oral argument that a private citizen guest in the home could have done exactly what Liebich did.

¶ 69   The dissent suggests that, before looking into the cabinet, Officer Liebich needed to have some sort of belief that "criminal activity was afoot" and that, at best, he had nothing more than "a mere suspicion." ¶¶ 142-43. The dissent concludes that "[t]his was a search, pure and simple." ¶ 144.

¶ 70   The dissent ignores decades of precedent to opine that Liebich performed a search when he used his flashlight to look into the cabinet. During oral argument, defense counsel stated that "it all comes down to: are the police justified to be where they're standing? If they aren't, none of this flashlight talk matters. I'm not taking umbrage with the use of the flashlight. Does the office have a legal reason to be there?" We have not broken "new ground." Instead, we have followed well established precedent. Officer Liebich (1) was lawfully in a position from which to view the objects seized, (2) it was immediately apparent that they were contraband, and (3) Liebich had a lawful right of access to the objects. *People v. McCavitt*, 2021 IL 125550, ¶ 111.

¶ 71   What seems to be most troubling to the dissent is that Officer Liebich's discovery of the contraband in this case was not inadvertent. In other words, the drugs were not sitting out in the

open such as on the kitchen counter. In *Horton v. California*, the Supreme Court explained that, while "inadvertence is a characteristic of most legitimate 'plain-view' seizures, it is not a necessary condition." 496 U.S. 128, 130 (1990).

¶ 72    The dissent questions our reliance on *Payton v. New York* for the proposition that the plain-view doctrine applies to observations inside the home. At issue in *Payton* was whether the police were lawfully inside the defendant's home when they observed a shell casing in "plain-view" that was later admitted in the defendant's murder trial. The Supreme Court held that the New York statute that permitted routine nonconsensual felony arrests inside the home was unconstitutional. The Supreme Court also noted that, "[a]lthough it is arguable that the warrantless entry to effect Payton's arrest might have been justified by exigent circumstances, none of the New York courts relied on any such justification." *Payton,* 445 U.S. at 583. On remand the Court of Appeals of New York remanded the case to the trial court to give the government "an opportunity to submit proof of exigent circumstances, if any, at a new hearing." *People v. Payton*, 51 N.Y. 169, 178 (1980). In other words, if there were exigent circumstances, the plain-view observation and seizure inside the home would stand.

¶ 73    Nowhere in our analysis do we suggest that "police may go anywhere in your home that they want, just as a guest might be so inclined." It is undisputed that Officer Liebich did not violate the Fourth Amendment in arriving at the place from which he observed the cabinet's contents. Liebich's motives for looking into the cabinet are irrelevant. *People v. Lewis*, 363 Ill. App. 3d 516, 523 (2006).

¶ 74    There are cases from other states and federal cases that offer persuasive authority. In *United States v. Serrano*, 2023 WL 2297447, police responded to the defendant's home after receiving a report that the defendant had sexually assaulted his stepdaughter. *Id.* at 1. The defendant's wife

allowed the officers inside the residence. *Id.* The victim told police that the defendant had given her cocaine and sexually assaulted her the previous night. *Id.* The wife led the police to the garage, referred to by defendant as his "man cave," "which was usually locked and limited to Defendant's use." *Id.* at 2. Inside the garage, the defendant kept a "locked workbench allegedly containing cocaine and other drugs." *Id.* at 1. One of the agents "attempted to view what was inside by peering through a one-inch gap in the workbench with the aid of a flashlight." *Id.* The agent could see "weighing scales and white residue that resembled either cocaine or fentanyl." *Id.* The agent did not "manipulate, pull or pry" the workbench while peering inside. *Id.* at 3. The court denied the defendant's motion to suppress, finding that "[t]he scales and white residue inside the workbench were exposed to plain view through a gap in the workbench's drawer; therefore, observations of them did not invade Defendant's privacy." *Id.* (citing *Hicks*, 480 U.S. at 328).

¶ 75 Another case of interest is *State v. Hite*, 642 So. 2d 55 (1994). In *Hite*, police responded to a report of gunshots being fired in the backyard of the defendant's house. *Id.* at 56. Defendant consented to allow the police into the home to make sure no one needed assistance. *Id.* When asked if he owned any firearms, the defendant stated that he had a collection and he offered to show a deputy his guns to make sure none of them had been fired. *Id.* When the deputy began to leave the bedroom, which was dark, he pointed his flashlight toward a "partially open" closet door. *Id.* The deputies saw marijuana plants inside the closet. *Id.* The trial court granted the defendant's motion to suppress, ruling that the deputy "intentionally shined his flashlight into the closet, exceeding the scope of the search to which the defendant had consented." *Id.* The District Court of Appeal of Florida reversed, holding that the "deputy was in the bedroom with the consent of the defendant. Once there, he was not obliged to shield his eyes from objects other than those he entered to inspect." *Id.* With respect to the flashlight, the court stated, "the use of the flashlight to illuminate

the partially open closet area does not constitute a search or violate constitutional principles. The flashlight merely enhanced the officer's plain view." *Id.*

¶ 76 In *People v. Glick*, 250 P. 3d 578, 581 (Co. Sp. Ct. 2011), police officers were conducting a welfare check. When the defendant left the front door open while he went to get his girlfriend, the police shined their flashlights through the partially open door and observed drugs. *Id.* The evidence established that, without the flashlights, the police could not have seen into the home. The trial court granted the defendant's motion to suppress, ruling that, when a police officer "shines a flashlight into an automobile in a public place, anything seen in the passenger compartment is considered in plain view." *Id.* The trial court reasoned that "the expectation of privacy in a home is higher than in a car" and "the use of the flashlight to see inside a home constitutes an unreasonable search, even where officers do so from a location where they have a right to be." *Id.* The Supreme Court of Colorado, sitting *En Banc*, reversed, holding that the plain-view doctrine applied and the seizure did not violate the Fourth Amendment. *Id.* at 583-86.

¶ 77 With all due respect to our dissenting colleague, there is no authority for the proposition that the use of a flashlight transformed Liebich's actions into a search. The trial court asked defense counsel if he had any authority for that argument, and he answered that he did not but it was "the totality of the circumstances." The dissent cites cases that involved physical intrusions. ¶¶ 98-99. See *People v. Martin*, 2017 IL App (1st) 143255, ¶ 29 ("Officer Warner physically intruded on the inside of the home to gather evidence"); *People v. Payton*, 317 Ill. App. 3d 909, 911 ("O'Dekirk then lifted the cover off the grill and observed a bag filled with cocaine"). Liebich did not physically intrude into the cabinet. He used his flashlight to look inside.

¶ 78                                     III. CONCLUSION

¶ 79 Accordingly, the judgment of the circuit court of Du Page County is affirmed.

¶ 80    Affirmed.

¶ 81    JUSTICE HUTCHINSON, specially concurring.

¶ 82    I agree with the majority's conclusion in this case. However, I write separately to voice my concerns about how the parties chose to proceed with this case in the trial court.

¶ 83    Defendant filed a motion to suppress the evidence seized pursuant to the warrant, in essence alleging that the warrant should not have been issued. Instead of presenting the trial court with the search warrant affidavit, which was relied upon by the issuing magistrate, the parties elected to call the officers as witnesses and present their testimony as to what occurred that day. This was an obvious disservice to the trial court judge and the defendant. The affidavit, presumably, recited the officers' observations *as they were relayed to the magistrate who issued the warrant*. I can think of no sound strategic reason for defendant's counsel to fail to introduce that critical document. True enough, it would not be dispositive of the lawfulness of the search, but it is unquestionably *relevant*. And the complaint for search warrant and supporting affidavit would be the "best evidence" of what the officers and the issuing judge relied upon to issue the warrant. Nevertheless, we must also accept that the parties know what is in their own best interests and we must act accordingly. See *People v. Givens*, 237 Ill. 2d 311, 323-24 (2010).

¶ 84    The record, for better or worse, is the evidence that both parties submitted. On that evidence, I agree with Justice Birkett and the trial court judge that the search in this case was justified. Officers were summoned to defendant's home because it was quickly filling up with natural gas, and he was either asleep or unconscious (or worse) inside. The situation was an obvious mortal danger to defendant and his neighbors. If this was not "emergency aid," then candidly, I don't know what is. As we recited many years ago, " 'the business of policemen and firemen is to act, not to speculate or mediate on whether the report [that drew them to the location]

is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process.' " *People v. Speer*, 184 Ill. App. 3d 730, 740 (1989) (quoting *Wayne v. United States*, 318 F.2d 202, 212 (D.C. Cir. 1963)). Oddly enough, my colleague who dissents today concurred in that statement long ago in Speer. I believe he was correct then.

¶ 85    The majority correctly concludes that no Fourth Amendment violation occurred because (1) Officer Liebich was lawfully in a position from which to view defendant's contraband, (2) the items' incriminating character was immediately apparent, and (3) Officer Liebich had a lawful right to keep his eyes open and see them. I find the cases relied upon by the dissent, including *Arizona v. Hicks*, 480 U.S. 321 (1987), distinguishable. There is no dispute that Liebich was able to see inside the cabinet. Unlike the circumstances in *Hicks*, Liebich did not manipulate any object in the defendant's home; he merely saw what he saw, which was contraband. As the trial court noted, "Without any more information about the search warrant or the circumstances surrounding the issuance of the search warrant, the Court cannot find that that search warrant is somehow invalid under the [Fourth] Amendment." I agree with the trial court and Justice Birkett. This police-citizen interaction began as emergency aid, which blossomed into reasonable suspicion, and then ultimately ripened into probable cause—the absence of the search warrant affidavit notwithstanding. Consequently, I concur; defendant's Fourth Amendment rights were not violated.

¶ 86    PRESIDING JUSTICE McLAREN, dissenting.

¶ 87    "[W]hen it comes to the Fourth Amendment, the home is first among equals. At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' " *Florida v. Jardines*, 569 U.S. 1, 6 (2013) quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961). The majority treats defendant's home here as a public place subject to police officers' suspicions.

¶ 88     A mischaracterization in the majority's analysis is its assertion that, as defendant concedes that a private citizen guest in the home could have looked into the cabinet (see *supra* ¶¶ 52, 62, 66, 68), Liebich could also look into defendant's cabinet.

¶ 89     First, I must take issue with the majority's assertion that counsel made any such concession. In response to Justice Birkett's question at oral argument of "Could a normal private citizen who was in that kitchen have looked into that cabinet in the same way, for example, a guest in the home?," appellate counsel answered, "Under the Fourth Amendment, he could, because he is not a government actor." (April 18, 2023 oral argument audio, approximately 7:00-7:20). Later when Justice Birkett told counsel, "You conceded that somebody who was a guest in the home could have looked in [the cabinet]," the following colloquy ensued:

"JUSTICE McLAREN: I don't think that [counsel] said what you just said. I think what he said was that if a guest looked in, that wouldn't be State action and that, therefore, it would not be a search. I don't think he said that [defendant] would have given consent for a guest to look inside or to break the chain in order to see what was inside.

COUNSEL: That's a very concise and accurate presentation of my view.

JUSTICE BIRKETT: A police officer in terms of making a plain view observation stands in the shoes of a private citizen or a guest in the home.

COUNSEL: Well, in that case, if a guest in the house tried to look into a clearly locked cabinet, I would imagine that the homeowner would take umbrage with that." (April 18, 2023 oral argument audio, approximately 47:25-48:30).

¶ 90     I see no concession that "a private citizen guest in the home could have looked into the cabinet with a flashlight and made the same observation as Liebich" (*supra* ¶ 52), let alone that Liebich's examination of the cabinet was proper for Fourth Amendment purposes because a nosy

neighbor could have looked inside. I would like the majority to provide a citation to any such claimed concession. Counsel's answers to Justice Birkett's question and assertions were couched in a Fourth Amendment analysis that clearly disputed their unstated premise—that police officers can do whatever a citizen may do in someone's house. Any claim that counsel conceded to the majority's view on this issue is unsupported by the appellate record and is incorrect. Furthermore, Justice Birkett's analysis is based upon the contraband being in plain view; I submit that, under the present case law, it was not.

¶ 91    I note, with no disrespect to defense counsel, that concessions do not constitute legal precedent. We look to the two Constitutions, statutes, ordinances, and case law for precedent, not defendant's "concessions" during oral argument. Further, we are not necessarily bound by a party's concessions. *Koulogeorge v. Campbell*, 2012 IL App (1st) 112812, ¶ 21.

¶ 92    In any event, the majority overestimates the import of such a "concession" made during questioning at oral argument. As our supreme court has said:

> "We note, however, that the purpose of questioning during oral argument is simply to help the justice asking the question to better understand the controversy. Questions by the court are not and have never operated as a limitation on the grounds the court may ultimately invoke in resolving a case." *Jackson v. Board of Election Commissioners*, 2012 IL 111928, ¶ 35.[4]

---

[4]I must also point out that the majority's citation to *Colyar* regarding concessions at oral argument (see *supra* ¶ 68) is wrong in that it fails to note that *Colyar*, in fact, quoted from Justice Freeman's partial concurrence/partial dissent (joined by Justice Burke) in *Jackson*, not from Justice Karmeier's majority opinion.

An isolated statement "contrary to everything counsel said in the remainder of his argument and in his briefs does not amount to a concession." *People. v. Holmes*, 2019 IL App (1st) 160987, ¶ 44. This is especially so when the concession is an "equivocal verbal statement" made in response "when asked by the judge in the throes of oral argument." *U.S. Bank National Association v. Miller*, 2020 IL App (1st) 191029, ¶ 24. See also *Colyar*, 2013 IL 111835, ¶ 92 (Burke, J., dissenting, joined by Freeman, J.) ("I take it as a given that contradictory statements made by an attorney cannot form the basis of a binding concession, particularly in a criminal case."). The majority has no basis in the record to claim that counsel made any such concession.

¶ 93 The majority's theory that the actions of police officers and private citizens in someone's home are to be treated and analyzed the same is curiously enigmatic, considering the distinction between state action and non-state action. The basic purpose of the Fourth Amendment is to "safeguard the privacy and security of individuals against arbitrary invasions *by governmental officials*." (Internal quotation marks omitted.) (Emphasis added.) *Michigan v. Tyler*, 436 U.S. 499, 504 (1978). The Fourth Amendment's "proscription against unreasonable searches and seizures does not apply to searches or seizures conducted by private individuals." (Internal quotation marks omitted.) *People v. Mueller*, 2021 IL App (2d) 190868, ¶ 41. I cannot understand how the majority can imply that police officers, as state actors to whom the Fourth Amendment applies, can do whatever private citizens can do in someone's home.

¶ 94 The majority's citations to case law do not support its interpretation that police can do anything that a guest "can do" in your house. The majority twice quotes from *Caniglia v. Strom*, 141 S. Ct. 1596, 1599 (2021) for the proposition that that "officers may generally take actions that " 'any private citizen might do' without fear of liability." See *supra* ¶¶ 40, 50. The majority takes

this to mean that anything that someone *could physically do* if you allowed them into your house[5] can also be done by the police. For some context, we look to the case that the *Caniglia* court cited for support for this statement—*Florida v. Jardines*, 569 U.S. 1 (2013). In citing to *Jardines*, the *Caniglia* court gave a parenthetical example of the type of action that any private citizen or police officer might do, per the *Jardines* majority: "(approaching a home and knocking on the front door)." *Caniglia*, 141 S. Ct. at 1599.

¶ 95    So, according to the majority, because both citizens and police can knock at the front door of your home, both may also look through your locked up possessions inside your home? The majority essentially concludes that the police may go anywhere in your home that they want for any purpose they want, just as a guest might be so inclined. What the majority enthymatically assumes is that what a person "could" do is also what he is "allowed" to do. However, courts have always recognized limits on what outsiders can do in a person's home—customs, and social norms. For example, in *Jardines*, officers brought a drug-sniffing dog to the defendant's home; the dog alerted at the front door. Officers obtained a search warrant and discovered marijuana plants during a subsequent search. *Jardines*, 569 U.S. at 4. The Court related:

> " 'A license may be implied *from the habits of the country*,' notwithstanding the 'strict rule of the English common law as to entry upon a close.' [Citation.]. We have accordingly recognized that 'the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds.' [Citation.] This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. Complying with the terms of that *traditional invitation* does not

---

[5]In the context of this case, that would mean looking into a padlocked cabinet.

require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters. Thus, a police officer not armed with a warrant may approach a home and knock, *precisely because that is 'no more than any private citizen might do.' Kentucky v. King*, 563 U.S. _____, ____-, 131 S. Ct. 1849, 1862, 179 L.Ed.2d 865 (2011)." (Emphases added.) *Id*. at 8.

The Court then found that there was "no customary invitation" to introduce a trained police dog to explore the area around the home in hopes of discovering incriminating evidence. *Id*. at 9. An invitation to bring up a dog to sniff for illegal drugs "assuredly does not inhere in the very act of hanging a knocker." *Id*. Neither does a search inside a padlocked and chained kitchen cabinet.

"To find a visitor knocking on the door is *routine* (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to—well, call the police. The scope of a license—express or implied—is limited not only to a particular area *but also to a specific purpose*. Consent at a traffic stop to an officer's checking out an anonymous tip that there is a body in the trunk does not permit the officer to rummage through the trunk for narcotics. Here*, the background social norms* that invite a visitor to the front door do not invite him there to conduct a search." (Emphases added.) *Id*.

¶ 96    The *Caniglia* court used even stronger language. In *Caniglia*, officers responded to a call from the petitioner's wife requesting a welfare check on the petitioner. While denying that he was suicidal, the petitioner agreed to go to the hospital for a psychiatric evaluation only after the officers allegedly promised not to confiscate his firearms. After allegedly misinforming the petitioner's wife about his wishes, the officers subsequently entered the home and seized two

handguns. *Caniglia*, 141 S. Ct. at 1598. While the Supreme Court decided the case on other grounds, the Court noted that the First Circuit Appellate Court did not "find that respondents' actions were akin to what a private citizen might have had *authority to do* if petitioner's wife had approached a neighbor for assistance instead of the police." (Emphasis added.) *Caniglia*, 141 S. Ct. at 1599. Citizens, let alone police officers, do not have *carte blanche* to do whatever they want in someone's home.

¶ 97   Illinois courts have also acknowledged limits on what private citizens and (to an even greater degree) police officers can do in the home of another. For example, in *People v. Martin*, 2017 IL App (1st) 143255, officers conducting a narcotics surveillance watched a drug sale in which the defendant stood on the immediate threshold of the slightly-ajar door of his mother's home, reached into the door inside of the doorframe and retrieved a blue plastic bag. *Martin*, 2017 IL App (1st) 143255, ¶ 4. After placing the defendant in custody, an officer reached inside the open door, reached above the doorframe on the inside of the door and recovered the bag. *Id*. ¶ 5. Citing to the background social norms from *Jardines*, the appellate court found that the officer reaching inside the door to retrieve the evidence "was well beyond what an *ordinary private citizen could do*" and that "[a] private citizen *would not think* that he could breach the open door of a home and investigate its contents." (Emphases added.) *Id*. ¶ 29.

¶ 98   In *People v. Payton*, 317 Ill.App.3d 909 (2000), an informant told police that drugs were being sold at a specific house and that the drugs may have been hidden on the front porch of the house. Officers proceeded to the house and found the defendant, who matched the informant's description, and another man on the front porch. While one officer spoke with the men, another officer noticed a barbeque grill on the porch; when he lifted the cover off the grill, he saw a bag filled with cocaine and another bag containing four smaller bags filled with cannabis. *Id*. at 911.

The appellate court noted that "[i]t is hard to imagine a member of our society not being surprised, and even defensive, upon discovering an uninvited person on his porch lifting the lid from his family's barbeque grill and inspecting its interior." *Id*. at 913. The appellate court reversed the trial court's denial of the defendant's motion to suppress and reversed his convictions. As in this case, the grill, like the cabinet, was in plain view, but the contraband was not, and the defendants expected privacy in the outer containers that were in plain view.

¶ 99     The error of the majority's position is highlighted by the Supreme Court's decision in *Hicks*, 480 U.S. 321, which the majority cites for support in its plain view analysis. See *supra*, ¶ 53. In *Hicks*, officers entered the defendant's apartment looking for a shooter, potential victims, and weapons. One of the officers noticed expensive stereo equipment that looked out of place in the "squalid" apartment. *Id*. at 323. One of the officers moved some of the components in order to read and record their serial numbers. Various components were determined to have been taken in an armed robbery, and the defendant was subsequently charged. *Id*. at 323-24. The state trial court granted the defendant's motion to suppress, and the Supreme Court affirmed that decision, stating: "*But taking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of respondent's privacy unjustified by the exigent circumstance that validated the entry.*" (Emphasis added.) *Id*. at 325. How can the majority reconcile that decision with its own unsupportable theory that anything a citizen can do, an officer can do? A private citizen can move stereo equipment that is located inside someone else's house and write down the serial numbers; why, if the majority here is correct, did the Supreme Court conclude that such actions by the police officer created an unjustified invasion of privacy and affirm the decision suppressing the evidence? Has *Hicks* been abandoned and abrogated by this majority's incomplete and incorrect syllogism?

¶ 100 In *Mikrut*, this court held that, while the officers were "justified in doing what was necessary to prevent violence between" the residents of the home, "this did not give the police a general warrant to intrude wherever they wanted." *Mikrut*, 371 Ill. App. 3d 1153. However, an invitee in one's home "could" go anywhere in the home once inside. "Doing" anything a private citizen can do includes "being" anywhere that the citizen could be. It also includes actions that are not a violation of constitutional safeguards *only* because there is no state action. The majority's attempt to equate actions of police with private citizens in this manner is patently incorrect.

¶ 101 Even if we were to accept the majority's bizarre analogy as legally correct, it would be inapt under the facts here, as our privacy is legally protected even from the prying eyes of nosey neighbors. The tort of intrusion upon the seclusion of another is defined in Restatement (Second) of Torts § 652A, at 376 (1977) as "an intentional interference with [a person's] interest in solitude or seclusion, either as to his person or as to his private affairs or concerns, of a kind that would be highly offensive to a reasonable man." Restatement (Second) of Torts § 652B, Comment a, at 378 (1977). Our supreme court (while not holding at that time whether the tort was actionable in Illinois) stated the parameters of the tort thusly: "[T]he nature of this tort depends upon some type of highly offensive prying into the physical boundaries or affairs of another person. *** [T]he core of this tort is the offensive prying into the private domain of another." *Lovgren v. Citizens First National Bank of Princeton*, 126 Ill. 2d 411, 416 (1989). The four-prong test for stating a cause of action for this tort is: "(1) an unauthorized intrusion or prying into the plaintiff's seclusion; (2) an intrusion that is highly offensive or objectionable to a reasonable person; (3) that the matter upon which the intrusion occurs is private; and (4) the intrusion causes anguish and suffering." *Jacobson v. CBS Broadcasting, Inc.*, 2014 IL App (1st) 132480, ¶ 47. Not even a private citizen is free to

intrude into a person's private seclusion (for example, a padlocked cabinet inside the person's home).

¶ 102  The weakness of the majority's position is made manifest by others involved in this case. If police can do anything that John Q. Public can do in someone's home, why did the trial court here rule that, because Stanish moved the cabinet door before peering into the cabinet, his actions "would not be an authorized search?" Stanish himself testified that they did not seize the items from inside the cabinet upon initial observation "[b]ecause we weren't going to go into the locked cabinet without a warrant." A private citizen "could" pull open a slightly ajar padlocked cabinet door a couple of inches and peer inside; he could also reach into a cabinet and pull out the contents. Does the majority actually mean to say that an officer can do anything that a private citizen could do in your house except touch or seize things?

¶ 103  All of this demonstrates that neither tolerated visitors, invited guests, nor the police, are granted license to do whatever they want to do while in or on our private property. The majority's constant repetition that a private citizen guest in defendant's home "could peer" into the interior of the padlocked cabinet disregards both established case law and the norms of a civilized society. While a private citizen could physically do so, we do not expect, nor are we required to condone, such action. Even less so must we expect or condone such actions from a police officer. What is merely oafish behavior by a neighbor is an abuse of governmental authority and the violation of constitutionally protected liberties when performed by law enforcement personnel. Yet the majority repeatedly reprises its vague and truncated version of caselaw, providing a foundation for future mistaken comparisons. The majority is legally (and civilizationally) incorrect, and its repetition of this analogical correlation is contrary to the history and policy of preserving the sanctity of the home.

¶ 104 This idea of what others can do in one's home is related to that of the "expectation of privacy," a concept to which the majority pays little or no heed. The privacy-based approach to fourth amendment jurisprudence "has its roots in Justice Harlan's short, but oft-referenced, concurrence in *Katz* [*v. United States*, 389 U.S. 347 (1967)], which 'decoupled violation of a person's Fourth Amendment rights from trespassory violation of his property." *People v. Lindsey*, 2020 IL 124289, ¶ 33. Our analysis of fourth amendment cases "begins and ends, therefore, with the question of whether the defendant has established a legitimate expectation of privacy in the place searched." *Id.* ¶ 16. A defendant "must point to a source outside the [federal and state] constitution—namely, formal property interests or informal privacy interests." *Id*. "Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law *or to understandings that are recognized and permitted by society*." (Emphasis added.) *Rakas v. Illinois*, 439 U.S. 128, 143 n.12 (1978). "When the government, *even in the absence of a physical intrusion* into a constitutionally protected area, obtains information by invading a reasonable expectation of privacy in persons, houses, papers, or effects without a warrant, an unconstitutional search occurs." (Emphasis added.) *Lindsey*, 2020 IL 124289, ¶ 33.

¶ 105 In order to claim protection under the fourth amendment, a person must have exhibited an actual subjective expectation of privacy in the place searched or thing seized; such expectation must be one that society is willing to recognize as reasonable. *McCavitt*, 2021 IL 125550, ¶ 59. There is no bright-line rule to determine whether an expectation of privacy is constitutionally reasonable. *Id*. ¶ 60. Whether a legitimate expectation of privacy exists in the place searched or the property seized depends on multiple factors including: (1) property ownership, (2) whether the defendant was legitimately present in the area searched, (3) the defendant's possessory interest in

the area searched or the property seized, (4) prior use of the area searched or property seized, (5) the ability to control or exclude others' use of the property, and (6) a subjective expectation of privacy in the property. *Id.* "Whether a person's expectation of privacy in an area searched is legitimate is determined by an objective standard drawn from common experience and based on the totality of the circumstances." *Id.*

¶ 106   All of these factors inure in defendant's favor as to an expectation of privacy. The kitchen cabinet was in defendant's home, a place where defendant clearly had a superior position to anyone else of ownership, possessory interest, prior presence in and use of the property, and the ability to exclude or control others' use of the property. Beyond the general expectation of privacy one has within his own home, defendant had placed the various contents inside a cabinet and chained and padlocked the cabinet doors to keep anyone else out. An individual generally retains a reasonable expectation of privacy in the contents of a closed container that conceals its contents from plain view. *McCavitt*, 2021 IL 125550, ¶ 61. That the cabinet doors, for whatever reason, did not close tightly so that a one-inch gap remained open does not obviate defendant's intent to keep all others from being able to view or have access to the contents of the cabinet. The fact that a camera was pointed at the locked cabinet suggests that defendant planned to enforce his expectation of privacy by identifying anyone who violated it.

¶ 107   The majority never truly addresses the idea that defendant could have an expectation of privacy in a locked cabinet inside his own house. Instead, quoting from *Payton*, 445 U.S. at 587, the majority claims that the law is "well settled that seizure of property in plain view *inside a home* 'involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.' " (Emphasis added.) *Supra*, ¶ 45. Let us look at the actual quote from *Payton*, 445 U.S. at 586-87:

"Yet it is also well settled that objects such as weapons or contraband *found in a public place* may be seized by the police without a warrant. The seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity." (Emphasis added.)

¶ 108    Where in this quote is there any mention of this alleged well-settled law involving the seizure of property in plain view *inside a home*? It does not exist. In the sentence immediately preceding that quote, the supreme court stated, "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id*. at 586. In the sentence immediately after the quote, the court noted "[t]he distinction between a warrantless seizure in an open area and such a seizure on private premises." *Id*. at 587. The majority goes on about the speculative implications of the case on remand in the state courts (see *supra* ¶ 72), but the fact remains that the majority has provided a *pinpoint cite*, incorporating quoted language, that in no way says what the majority claims, and the majority refuses to correct this misstatement.

¶ 109    The majority dismisses defendant's argument that, "by locking the cabinet, he expressed his interest in privacy and that the cabinet was ajar through 'no fault of his own' " by quoting from *Dickenson*, 508 U.S. at 375 the proposition that " '[t]he rationale of the plain view doctrine is that if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no 'search' within the meaning of the Fourth Amendment—or at least no search independent of the initial intrusion that gave the officers their vantage point." *Supra* ¶ 56. But how does the majority conceive that the contraband in this case was "left in open view?" The only thing in "open view" was the padlocked cabinet. It is *undisputed* that the contraband was *inside* the cabinet, and the contents of the cabinet

*were not seen* until Liebich positioned himself to look into a one-inch opening in the cabinet's doors with the aid of a flashlight. If the contraband was in plain view, why did Liebich need to illuminate the inside of the cabinet to identify its contents? I submit that plain view has been enlarged to include self-help and a focused intrusion outside the authority for the officer's presence.

¶ 110　Furthermore, at the hearing on defendant's motion to suppress, Stanish agreed with the statement that "the chain was wrapped pretty tightly around the handles of the cabinets" and that he "couldn't really open it too far because of that chain." The fact that one door of the tightly chained and padlocked cabinet was ajar approximately one inch does not negate defendant's *expectation* of privacy evidenced by the placement of items inside of a tightly chained and padlocked cabinet. One still has a subjective expectation of privacy in items kept behind a closed, locked door even if the door has a keyhole through which one could peep, or the door has warped or shrunk such that one could peep underneath the door. It is an "expectation" of privacy, not a "perfection" of privacy that proscribes the unauthorized intrusion.

¶ 111　The majority goes to great lengths to dispute that Liebich's actions looking into the cabinet constituted a search of the cabinet. See, for example, *supra* ¶ 52 ("Defendant cites no authority for his argument that Liebich's actions constituted a search.); ¶ 56 (" 'The rationale of the plain view doctrine is that if contraband is left in *open view* and is observed by a police officer from a lawful vantage point,[6] there has been no invasion of a legitimate expectation of privacy and thus no

---

[6]"Vantage point" is defined as "a position or standpoint from which something is viewed or considered." See https://www.merriam-webster.com/dictionary/vantage%20point (last viewed Sept. 8, 2023). There is nothing in its definition or its synonyms that reference controlling the

'search' within the meaning of the Fourth Amendment—or at least no search independent of the initial intrusion that gave the officers their vantage point.' *Minnesota v. Dickenson*, 508 U.S. 366, 375 (1993).") (Emphasis added.); ¶ 60 ("Again, defendant has not cited any precedent for the proposition that Liebich's actions in looking into the cabinet with his flashlight was a search.). This is the equivalent of the false argument that "absence of evidence is evidence of absence". The majority presumes that, because no one has raised the point before, the point did not exist prior, and the unstated conclusion must inure to its benefit. Put another way, according to the majority, if extrapolation is necessary, the conclusion cannot benefit the proponent.

¶ 112    This position by the majority is all the more baffling because, in its "analysis" of Liebich's use of the flashlight (see *supra* ¶¶ 45, 74-77), the majority fails to cite to a single precedential (Illinois or United States Supreme Court) case that is factually similar to this one. No case cited in ¶ 45 involved the use of illumination in someone's home. Every case cited involved illumination of a boat on the high seas (*Lee*), a car (*Hampton*, *Brown*, *Luedeman*) or a barn located in an open field outside the curtilage of the home (*Dunn*). The majority's citation of those cases is an enthymeme,[7] as it presumes that cars and homes are identical for Fourth amendment purposes. However, it bears repeating: "[W]hen it comes to the Fourth Amendment, the home is first among

_____

amount of illumination with an object such as a flashlight. The vantage point is a location, not a condition that sheds light or darkness through artificial means.

[7]"An enthymeme is a 'syllogism in which one of the premises is implicit.' " See *Fox Fire Tavern v. Pritzker*, 2020 IL App (2d) 200623, n. 2 (McLaren, J., specially concurring quoting Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/enthymeme (last visited Nov. 10, 2020) [https://perma.cc/9KVE-PHQT].

equals." *Jardines*, 569 U.S. at 6. "What is reasonable for vehicles is different from what is reasonable for homes." *Caniglia*, 141 S. Ct. at 1600. The majority points to no authority that treats a search of the home as nothing more than a search of a car or a barn located in an open field. Flashlights were patented in 1898;[8] one would expect that if flashlights are used to view things in plain view in the home, there would be at least one case where it was properly used in a residential setting. However, neither the State, the trial court, nor the majority has cited to such authority, let alone to such a search where the flashlight is used to *establish* probable cause when the property is not identifiable and the search of the area was a departure from the emergency exception.[9]

¶ 113   The use of a flashlight is not *per se* impermissible in a plain view situation. See *People v. True*, 85 Ill. App. 3d 606 (1980). In *True*, a police officer pulled up behind a car pulled over against the righthand curb in a fairly secluded residential area with its emergency flashers on. *Id*. at 606. The officer walked up to the driver's door carrying a flashlight "in order to determine if a 'motorist assist' was necessary." *Id*. at 607. While conversing with the driver, the officer shined his flashlight through the partially open driver's window into the car and saw marijuana seeds on the floor of a vehicle; subsequently, marijuana and a controlled substance were found in the car. *Id*. This court determined that it was "eminently reasonable" for the officer to use his flashlight where he was patrolling alone at night in a secluded area and the interior of the defendant's car was dark; further,

---

[8]See https://thepowerfacts.com/when-was-the-battery-flashlight-invented/ (last visited Sept. 11, 2023).

[9]I have no problem with the use of a flashlight in appropriate areas that are subject to search pursuant to a warrant or where probable cause has already been established. However, those situations are substantially different from that before us.

he "had justification to use his flashlight both to ascertain whether a passenger in the car needed his assistance and to become alerted to possible danger to himself from its occupants." *Id*. at 609. Use of the flashlight in those circumstances was reasonable; it was not deemed to be proper in all circumstances.

¶ 114   All of the cases cited by the majority in ¶ 45 (in addition to taking place somewhere other than the home) took place at night. In the case before us, however, Liebich was in defendant's house in the mid-morning hours with other emergency personnel, and there was no indication of any criminal activity. He testified that he used the flashlight only to look inside the cabinet, not for any other purpose. If the contraband was in plain view, what was the need for self-illumination (or the later manipulation of the doors)? Liebich's use of a flashlight was unreasonable under the circumstances as they existed. This view was embellished and not plain.

¶ 115   The majority later cites a series of non-precedential foreign jurisdiction cases as "persuasive authority" regarding the use of a flashlight in someone's home. See *supra* ¶¶ 74-76. Each of these cases is either factually distinguishable or actually supportive of my position. In *Serrano*, the search was in the defendant's *garage*, not his home. 2023 WL 2297447 at 1. As the allegation against the defendant was that he had drugged and sexually assaulted his daughter, evidence of drugs was an object of the search; the defendant's wife, who was found to have common authority over the garage, *led the officer to the locked workbench*, where the defendant "kept a locked workbench allegedly containing cocaine and other drugs." *Id*. The officer shone his flashlight through a one-inch gap in the workbench and saw drug paraphernalia and suspected drug residue. *Id*. Later, upon finding the key to the workbench, the wife unlocked it so that officers could look inside, whereupon they seized narcotics. *Id*.

¶ 116    *Serrano* is completely distinguishable from this case. Not only was the flashlight not used in the home, it was used to peer into a locked container to which the officer *had been led* by someone who had common authority over the garage *for the specific purpose of looking into the workbench for evidence of a crime.*

¶ 117    In *Hite*, the deputy, who was investigating a report of shots fired, was invited by the defendant to inspect his gun collection contained in the defendant's bedroom at 10:00 p.m.; the deputy "used his flashlight to inspect the guns *because the room was dark and the defendant had told him that the light was not working.*" (Emphasis added.) 642 So. 2d at 56. Before leaving the room, the officer shined his flashlight into the open door of the bedroom's closet and saw marijuana plants. As in *True*, the use of the flashlight in those circumstances was reasonable; it was night, and the lights in the room to which the defendant had taken the deputy did not work. The deputy was already using the flashlight for the legitimate purpose for which he was present.

¶ 118    Finally, in *Glick*, officers knocked on defendant's door for the purpose of investigating a 911 call from a female needing assistance. The defendant left the door " 'wide open' " when he left the officers outside and went to get his girlfriend. 250 P. 3d at 581. Without crossing the threshold of the door, the officers looked inside the house, in which no lights were on, and saw drug paraphernalia and suspected narcotics. *Id*. There was conflicting testimony regarding the lighting conditions at 6:15 a.m., but "the trial court's finding that the officers used their flashlights to see inside of Glick's home [was] not clearly erroneous." *Id*. at 582. The Colorado supreme court held:

"[W]e agree that an officer, who is positioned at a lawful vantage point, may use a flashlight to make plain view observations *that during daylight would not constitute a search* under the Fourth Amendment. When an officer's plain view observation of evidence *during*

*daylight* would not constitute a search for purposes of the Fourth Amendment, the fact that the officer *uses a flashlight because darkness has fallen* does not transform the officer's observations into an unreasonable search." (Emphases added.) 250 P. 3d at 584-85.

The fact that the officers in *Glick* used their flashlights to see inside the defendant's home "did not transform their plain view observations into a search because, *had it been daylight*, the contraband on the table inside the home would have been plainly visible to the officers." (Emphasis added.) *Id*. at 585. The court also noted that it did not address "whether it would constitute a search for an officer to use a flashlight in a situation in which a person, in effect, creates darkness within premises by the manner in which he closes and secures the building." (Internal quotation marks omitted.) Again, as in *True*, the circumstance of darkness plays a preeminent role in the plain view analysis; had there been natural light (or light provided by the defendant), the contraband would have been in plain view. Here, Liebich used his flashlight in daylight hours to look inside of a barely-opened cabinet; he did not use his flashlight for any other purpose. There was no lack of lighting to prevent him from doing what he originally went into the kitchen to do.

¶ 119    The majority quotes counsel at oral argument saying that, if police aren't justified to be where they're standing, " 'none of this flashlight talk matters. I'm not taking umbrage with the use of the flashlight. Does the office have a legal reason to be there?' " *Supra* ¶ 70. However, the majority fails to note that counsel's statement was *not* made in response to a question regarding the facts of *this case* or a question regarding the emergency exception to the warrant requirement in general. Instead, it was a response to a detailed hypothetical situation presented by Justice Birkett that involved officers "performing a criminal investigation" for manufacture of a controlled substance and shining a flashlight through the drawn curtains of the suspect's window. (April 18, 2023 oral argument audio, approximately 48:56-50:15). Counsel's full response was:

"All I'm saying is: are they justified to be where they're standing. If they aren't, none of this flashlight talk matters. I'm not taking umbrage with the use of the flashlight. It all comes down to does the officer have a legal reason to be there. *I don't know if I have enough information based on what you said to make that determination*, but it would ultimately come down to whether or not the officer is legally where he's at, *looking through that window*." (Emphases added.) (April 18, 2023 oral argument audio, approximately 50:15-50:51).

This response also came after counsel had started answering Justice Birkett's question by mentioning the officers being "concerned about the safety of the people in the house" but being interrupted and led back to the hypothetical criminal investigation. (April 18, 2023 oral argument audio, approximately 49:30-49:50).

¶ 120   Clearly, this was a response to Justice Birkett's tangentially-related hypothetical, not an agreement, admission or concession that the use of the flashlight is irrelevant to the facts of this case. See my discussion regarding concessions *supra* ¶¶ 89-92. The majority cherry-picks only a portion of counsel's statement and presents it out of context. This use of counsel's statement is misleading. I note that counsel's statement was the last thing he said in his last answer to the last question in his rebuttal argument. An isolated statement "contrary to everything counsel said in the remainder of his argument and in his briefs does not amount to a concession." *Holmes*, 2019 IL App (1st) 160987, ¶ 44. I find it highly unlikely that counsel would concede this issue, which he argued in his brief and at oral argument, at that point of the proceedings. However, even if it were a concession, I point out again that we are not necessarily bound by a party's concessions. See *Koulogeorge*, 2012 IL App (1st) 112812, ¶ 21.

¶ 121   At oral argument, Justice Birkett asserted that there is "more than 80 years of jurisprudence from the United States Supreme Court and virtually every state in this country that says that the use of a flashlight does not negate plain view." (April 18, 2023 oral argument audio, approximately 47:09-47:22; see also *supra* ¶ 45). The majority has yet to cite such a case proclaiming such a blanket approval that applies to the facts before us. If defendant has forfeited the issue for failure to cite appropriate authority (*supra* ¶ 45), the majority has committed the same act that it has accused defendant of committing.

¶ 122   The majority also questions defendant's claims regarding the length of time that Liebich spent looking into the cabinet (*supra* ¶¶ 35-37), and the amount of contortion that was necessary for Liebich to see into the cabinet (*supra* ¶ 62). However, the time involved, the use of the flashlight, and the contortions necessary are all merely tangential considerations. Common sense and case law both clearly establish that Liebich performed a search. If one is looking for his car keys and finds them hanging on a hook or happens to find them by opening a drawer, there is no difference between the two actions; they are both searches according to common definition. The fact that one search results in finding the keys in plain view neither results in the fiction that it is *not* a search nor in the claim that the other search involved plain view because only a flashlight was used to establish probable cause.

¶ 123   The majority attempts to distinguish *Hicks* by noting that, unlike the officer in *Hicks*, Liebich "did not move anything in order to see into the cabinet." *Supra* ¶ 67. This reasoning takes a restricted view of the *Hicks* holding. The Supreme Court found that the officer in *Hicks* commenced the search and produced a new invasion of the defendant's privacy by "taking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents." 480 U.S. at 325. He sought information (serial numbers) on stereo

equipment that, while catching his interest, had no relation to the basis for his lawful presence in the defendant's apartment (the search for a shooter, victims, and weapons). The officer moved the equipment to find the serial numbers, but that was not the *sine qua non* of the violation. The officer could have slid a telescoping mirror behind the pieces of equipment to read the numbers or contorted himself to be able to see the backside or bottom of the equipment without touching it. It is the diversion from the officer's objective and the exposure of concealed things that are the basis for the Fourth Amendment violation, not the mere fact that the officer moved the items. Simply put, the serial numbers, like the contraband here, were not in plain view.

¶ 124   Similarly, in our case, the search commenced when the officer focused his attention on the padlocked cabinet and moved to the vantage point to view its interior. He then looked into the cabinet and determined that it was too dark to discern its contents (there is nothing to indicate that the use of the flashlight merely confirmed what Liebich thought he saw in the dark). Then he decided to use the flashlight to see what was otherwise unseen from his vantage point. The use of the flashlight to illuminate the contents of the cabinet was the third action that exposed to view unseen portions of the house and its contents.[10]

¶ 125   The transition from emergency assistance to search was even more egregious in this case than in *Hicks*. In *Hicks*, the contraband stereo equipment was sitting out for anyone to see. Here, the contraband was not; it was contained inside a chained and padlocked cabinet. Under *Hicks*, the

---

[10]It is reasonable to conclude that, having not used his flashlight previously, Liebich would not have used the flashlight to look inside the cabinet unless he thought it was necessary. It is implicit that whether the flashlight would or would not be needed was based on an initial view of the interior.

search was improper when the first action taken, moving to the vantage point to view the inside of the cabinet constituted an action that was a departure from the purpose for the officer's presence in the home. Thereafter, the search became invasive when the expectation of privacy was breached by Liebich looking *inside* the cabinet with the embellishment of artificial illumination. The search was *per se* unreasonable without a warrant because the contraband was not in plain view. As in *Hicks*, the officers should have sought a search warrant before searching the inside of the cabinet that was not in plain view.

¶ 126   The majority not only concludes that it was *not* a search but that a search outside the scope of the reason(s) for entering the home without consent was legal because only a flashlight was utilized to see that which was not otherwise visible, *i.e.*, not in plain view. The plain view doctrine was based on the premise that an officer need not avert his view. See, *i.e.*, *California v. Ciraolo*, 476 U.S. 207, 213 (1986) ("The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares.") The majority expands that principle to include that an officer may *embellish or enhance* his view as well through artificial means after moving to a vantage point to not avert his view. However, that is not the premise of the majority's *ratio decidendi.* I *do* dispute the majority's assertion (see *supra* ¶ 73) that it is undisputed that Liebich did not violate the Fourth Amendment. His reasons for situating himself where he did and his motives are relevant to show that the location was a departure from the authority for which he was present in the home.

¶ 127   The special concurrence cannot seem to make up its mind about this search. First, Justice Hutchinson states that she agrees with the majority that "the search in this case was justified." *Supra* ¶ 84. Yet, in the very next paragraph, Justice Hutchinson finds that the majority "correctly concludes that no Fourth Amendment violation occurred" because Liebich had fulfilled the three

requirements necessary for the application of the plain view doctrine. *Supra* ¶ 85. If plain view applied here, there would be no search—seizure of an object in plain view is not a search under the Fourth Amendment. See *Illinois v. Andreas*, 463 U.S. 765, 771-72 (1983). The special concurrence conflates a search based upon suspicion and a non-search based on plain view.

¶ 128   The majority claims that I am troubled that Liebich's discovery of the contraband in this case was not "inadvertent." See *supra* ¶ 71. While the plain view analysis once required that the discovery of the evidence in plain view be inadvertent, inadvertence is no longer a required element. See *People v. Green*, 298 Ill.App.3d 1054, 1062 (1998). A simple word search of this document would reveal that, outside of this paragraph, I have never used the word "inadvertent." By falsely alleging that I am troubled by the lack of inadvertence, the majority is implying that I am employing an obsolete and erroneous formulation of the law in this case. This implication is a patent mischaracterization and should be disregarded.

¶ 129   Merriam-Webster defines a search as "to look into or over carefully or thoroughly in an effort to find or discover something;" "to examine in seeking something;" "to look through or explore by inspecting possible places of concealment or investigating suspicious circumstances;" "to look or inquire carefully;" "to make painstaking investigation or examination." The Supreme Court has held that "When the Government obtains information by physically intruding on persons, houses, papers, or effects, 'a 'search' within the original meaning of the Fourth Amendment has undoubtedly occurred." (Internal quotation marks omitted.) *Jardines*, 569 U.S. at 5. Our supreme court has stated that "[a] search implies a prying into hidden places for that which is not open to view." *People v. Bombacino*, 51 Ill.2d 17, 22 (1972). From a purely common-sense standpoint, looking into a closed, padlocked cabinet to see what, if anything, is inside the cabinet is a search. To claim that what was inside of that cabinet was in plain view such that no search was

necessary to see those items is both counterfactual and incredible. There is *no evidence* that the cabinet was large enough to hold a small child or adult or that it was a source of the gas leak, which were the claimed reasons for the officer's authority to remain in the home. Simply put, the intrusion, as that in *Hicks*, was a departure from the authority for Liebich's presence in the home.

¶ 130  Quoting from *Speer*, 184 Ill. App. 3d at 740, the special concurrence posits that, in a situation such as this which involves "mortal danger," police officers should "*act*, not [ ] speculate or mediate on whether the report [that drew them to the location] is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process." (Internal quotation marks omitted.) (Emphasis in original.) *Supra* ¶ 84.[11] Justice Hutchinson then chides me for concurring in *Speer* but not agreeing with her here. However, it is Justice Hutchinson whose positions in *Speer* and this case are counter intuitive. In *Speer*, officers showed up at the defendant's home because they had been informed that a young lady may have overdosed on narcotics in the house. After they were told that the young lady was not there, the officers asked if

---

[11]I do not dispute the emergency nature of Liebich's and Stanish's presence at defendant's home. The special concurrence need not embellish the emergency by claiming that the officers "were summoned to defendant's home because it was quickly filling up with natural gas, and [defendant] was either asleep or unconscious (or worse) inside." *Supra* ¶ 84. Both officers testified that they did not know about a person inside the home until firemen told them at their arrival. Further, there was nothing about that person being "asleep, unconscious or worse." As Stanish testified, he was told that "there was a gentleman inside refusing to come out of the residence. And they felt it necessary for him to come out and be evaluated since he had been breathing in gas all evening." The danger of the situation is amply demonstrated by the record as it exists.

they could come inside and look around. They did not find the woman; however, they found various drugs, paraphernalia, and weapons that led to criminal charges.

¶ 131 The trial court granted the defendants' motion to suppress, holding that "the exigent circumstances exception did not apply to this case because there was no probable cause to believe a crime had been committed within the residence." *Id*. at 738. In reversing the trial court, this court concluded:

> "In emergency cases such as the one presented here, however, where the police testified
> that the purpose of entering the residence was to check on the welfare of a person, rather
> than to make an arrest or search for evidence, the issue is not whether there was probable
> cause to believe a crime had been committed, but whether the police reasonably believed
> that an emergency existed which required them to act immediately to provide aid to
> someone in the residence." *Id.*

We also held that the State was not required to show that the officers believed "with certainty that [the woman] was in need of immediate assistance." *Id*. at 740. It was in this context that we reiterated that officers should act, not speculate or mediate.

¶ 132 Here, however, instead of acting in furtherance of their calling to an emergency situation, Liebich and Stanish *abandoned* the emergency and directed their attention to a cabinet that had absolutely no connection to the gas leak or the safety and whereabouts of any living creature. The police subordinated and abandoned the hazards of the gas leak to the search for contraband, the fruits of which were threatening neither life nor property. Under *Speer*, officers should act to address a possible emergency even if they are not certain that the emergency actually exists. While quoting from *Speer*, the special concurrence here actually applies the inverse of *Speer*, encouraging officers to *abandon an emergency that they are certain exists* to act on something totally unrelated

and speculative. The call to action by the special concurrence is *away* from a *real emergency* instead of *toward* a *possible emergency*. My colleague's application of *Speer* in this case is skewed at best.

¶ 133   While the majority cites to *Hicks*, the holding of the case is not consistent with the citation. The majority cites to *Hicks* for the proposition that the Supreme Court "rejected the argument that, because an officer's action directed to an object was unrelated to the justification for the entry into the defendant's apartment, 'it was *ipso facto* unreasonable.' " (*Supra* ¶ 53.) However, the Supreme Court found that the officer's moving of the equipment:

"did constitute a 'search' separate and apart from the search for the shooter, victims, and weapons that was the lawful objective of his entry into the apartment. Merely inspecting those parts of the turntable that came into view during the latter search would not have constituted an independent search, because it would have produced no additional invasion of respondent's privacy interest. [Citation.] But *taking action, unrelated to the objectives of the authorized intrusion*, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of respondent's privacy *unjustified by the exigent circumstance that validated the entry.*" (Emphases added.) *Hicks*, 480 U.S. at 325.[12]

---

[12]We are a state that has adopted the "limited lock step" approach to search and seizure issues. This limited lockstep approach is "based on the premise that the drafters of the 1970 constitution and the delegates to the constitutional convention intended the phrase 'search and seizure' in the state document to mean, in general, what the same phrase means in the federal constitution." *People v. Caballes*, 221 Ill.2d 282, 314 (2006). Under this doctrine, "we construe the search and seizure clause of our state constitution in accordance with the United States

¶ 134    In this case, Liebich clearly took action unrelated to the objectives of his authorized intrusion into defendant's home. Liebich was there to assist the fire department with a gas leak. The conduct of an officer conducting a search under the emergency exception "must always be consistent with the purported reason for the warrantless entry." *People v. Paudel*, 244 Ill. App. 3d 931, 942 (1993) citing *People v. Abney*, 81 Ill. 2d 159, 173–74 (1980). "Certainly the authority to enter a private residence for the purpose of rendering emergency assistance to an endangered person must not be perceived as an invitation to officers to conduct an exploratory search unrelated to the purpose of their entry." *Id.* at 943.

¶ 135    The majority cites approvingly to this courts Rule 23 order in *People v. Kolesnikov*, 2022 WL 1951607 (see *supra* ¶¶ 58-59), in which officers searching a home because of the possibility of an unknown, possibly injured, person discover buckets of marijuana plants growing in a basement room. The majority here notes that this court affirmed the trial court's denial of the defendant's motion to suppress; however, the majority fails to mention this court's finding, *inter alia*, that the limited scope of the officers' search was relevant to the reasonableness of their conduct: "*The officers did not search drawers or cabinets, where only small objects could be concealed*." (Emphasis added.) *Id.* ¶ 31.

¶ 136    Similarly, in *People v. Ramsey*, 2017 IL App (1st) 160977, officers responded to a 911 call about a woman screaming for help from a second-floor window and being pulled back into the house. After speaking to the victim, officers placed the defendant under arrest at his front door. They then:

---

Supreme Court's interpretation of the fourth amendment unless any of the narrow exceptions to lockstep apply." *People v. Holmes*, 2017 IL 120407, ¶ 24.

"walked through both floors of the residence to determine whether other perpetrators or victims were present. They checked closets, under the beds, and anywhere else a person could be hiding. There is no evidence that the officers *opened drawers or otherwise searched in locations where a human being could not hide*." (Emphasis added.) *Id.* ¶ 11.

Items related to the defendant's sexual assault of the victim, seen in plain view in the defendant's bedroom, were subsequently seized.

¶ 137   In affirming the trial court's denial of the defendant's motion to suppress, the appellate court held that "the emergency aid exception justified the warrantless entry of [the defendant's] residence, the search of the residence to locate other potential victims or offenders and the seizure of the evidence in plain view reasonably associated with" the assault of the victim. *Id.* ¶ 25. Once the officers saw the victim crying and with cut marks on her arms, "it was reasonable for them to walk through the entire residence to determine whether anyone else was present." *Id*. Importantly, there was "no evidence that officers *exceeded the scope of the permissible search by opening drawers or looking in, for example, kitchen cabinets*." (Emphasis added.). *Id*.

¶ 138   Here, Liebich's exploration of the cabinet was not claimed to be an attempt to discover a gas leak or an endangered human; therefore, his search was unrelated to his authorized reason for being present in defendant's home and exceeded the scope of any permissible search. By the time he arrived, fire personnel had already identified the stove as the source of the leak and were airing out the house, and Liebich's examination of the stove revealed no damage or anything about the stove that needed to be addressed. Further, there was no evidence that the cabinet was of a size that would hold a human being or that there was any indication that the cabinet was inhabited. At that point, Liebich's examination was unrelated to the objectives of his presence in the home. He should have left the kitchen and gone to find Stanish, as he testified he planned to do before he

saw the cabinet, or searched the rest of the house for other humans. Where the scope of a search exceeds that permitted by the character of the relevant exception from the warrant requirement, "the subsequent seizure is unconstitutional without more." *Horton*, 496 U.S. at 140. Liebich's search of the cabinet was a new invasion of defendant's privacy that was unjustified by the exigent circumstance that validated Liebich's entry. His actions were not justified by the circumstances, viewed objectively. See *King*, 563 U.S. at 464. Therefore, his conduct in looking inside the cabinet was unreasonable.

¶ 139   The *Hicks* Court also held that "[a] dwelling-place search, no less than a dwelling-place seizure, *requires probable cause*, and there is no reason in theory or practicality why application of the 'plain view' doctrine would supplant that requirement." (Emphasis added.) *Hicks*, 480 U.S. at 328. The "mere fact that the items in question came lawfully within the officer's plain view" did not "supplant the requirement of probable cause." *Id*. at 327. As the officer had a mere "reasonable suspicion," (*id*. at 326) instead of probable cause, the Court affirmed the trial court's suppression of the evidence. Our supreme court has cited this holding in *Hicks* as support for its own holding that, "if police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object, *i.e.*, if the incriminating character of the object *is not immediately apparent*, the plain view doctrine cannot justify the seizure." (Emphasis added.) *People v. Jones*, 215 Ill. App. 2d 261, 272 (2005). I submit that "immediately apparent" is not apt under the facts because the search commenced when Liebich focused his attention on the cabinet, moved to a vantage point, and then shined his flashlight into an area that was not in plain view.

¶ 140    The majority refers to the phrase "probable cause" throughout its decision, but *nowhere* does it analyze probable cause as it applies to the facts of this case. This is understandable, as there are no facts that could be analyzed to establish that probable cause existed.

¶ 141    A mere hunch is not probable cause. *People v. Dawn*, 2013 IL App (2d) 120025, ¶ 24. It requires more than mere suspicion but less than what is necessary to convict. *People v. Brodeur*, 189 Ill. App. 3d 936, 942 (1989) (McLaren, J., dissenting). Probable cause exists "where the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Id*.

¶ 142    The cabinet at issue in this case was nothing more than a locked and (imperfectly) closed container. By itself, the locked cabinet gave no immediately apparent indication of its contents; only by investigating the contents of the cabinet was Liebich able to determine that any criminal activity was afoot. See *Jones*, 215 Ill.2d at 272 ("However, if police lack probable cause to believe that an object in plain view is contraband *without conducting some further search of the object*, *i.e.*, if the incriminating character of the object is not immediately apparent, the plain view doctrine cannot justify the seizure." (Emphasis added.)). Again, the only thing in plain view was the cabinet; the contraband could only be seen by shining a flashlight in place for which probable cause had *not* been established. There was no evidence that Liebich had any indication, let alone expectation, that the cabinet contained any contraband before he looked inside the cabinet. See, *contra*, *Jones*, which noted, not only the experience and training of the specific Trooper involved, but the experience of the entire "Illinois law enforcement community" (215 Ill. 2d at 281) with respect to recognizing "one-hitter" boxes as drug paraphernalia:

"Viewed from [Trooper] Gebke's standpoint, *taking into account his training and experience*, we conclude that defendant's 'one-hitter' box proclaimed its contents. To a civilian, it is possible that Gebke's belief could seem to be a mere 'suspicion.' To Gebke, however, the contents of the box were a virtual certainty. See, *e.g.*, *Vassar*, 99 P. 3d at 995 (upholding, under fourth amendment, warrantless search of 'one-hitter' box during traffic stop where box in plain view, based on experience and training of arresting officer and distinctive configuration of box)***." (Emphasis added.) *Jones*, 215 Ill. 2d at 282.

¶ 143    Here, there is no evidence of any institutional experience with padlocked kitchen cabinets or that Liebich had any special training or experience that would lead him to have anything more than a mere suspicion that the cabinet was evidence of a crime. The cabinet possessed no incriminating character on its own. The plain view doctrine has no application to this case.

¶ 144    Liebich saw a padlocked cabinet and looked inside it, not having any probable cause to believe that it was evidence of a crime. This was a search of the cabinet, pure and simple, a search unrelated to the objectives of his presence in the home and unsupported by probable cause. The search was not only "*ipso facto* unreasonable" because it was unrelated to those objectives and not in plain view. See *Hicks*, 480 U.S. at 325. It was unreasonable because it was unrelated to the objectives *and* unsupported by probable cause.

¶ 145    The special concurrence's analysis similarly fails on the issue of probable cause. The special concurrence characterizes this case as a "police-citizen interaction [that] began as emergency aid, which blossomed into reasonable suspicion, and then ultimately ripened into probable cause." *Supra* ¶ 85. However, "reasonable suspicion" is insufficient for a plain view exception (see *Hicks*, 480 U.S. at 326), and the special concurrence has provided no authority for the notion that such suspicion can be given an opportunity to "ripen" into probable cause without

the issuance of a search warrant. As I noted above, "if police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object, *i.e*., if the incriminating character of the object *is not immediately apparent*, the plain view doctrine cannot justify the seizure." (Emphasis added.) *People v. Jones*, 215 Ill. App. 2d 261, 272 (2005). The probable cause in this case was established only *after* the search of the cabinet was effected. It seems that the special concurrence is putting the cart before the horse.

¶ 146  The special concurrence also is concerned that neither of the parties presented the trial court with the search warrant affidavit, instead relying on Stanish's testimony to establish what was presented to the issuing magistrate. See *supra* ¶ 83. However, Stanish clearly agreed that the "search warrant was based on what you and Officer Liebich had reported seeing in that cabinet, correct?" and, when asked the question again, stated, "I believe that's how Detective Gates typed it up and had it approved, yeah." The trial court gave "credit" to Stanish's testimony and found Stanish "to be credible." *Supra* ¶ 24. I submit that the present record is sufficient to address what appears to be the core of the matter despite not containing the actual affidavit.

¶ 147  Further, any other evidence that could have been contained therein would have been irrelevant and incompetent. Evidence that is obtained during an illegal search cannot serve as the basis for the issuance of a search warrant. *People v. Butler*, 2 015 IL App (1st) 131870, ¶ 52. A search warrant that is obtained based on evidence discovered during an illegal search should be quashed. *People v. Davis*, 398 Ill. App. 3d 940, 958 (2010). One exception to exclusion is the independent source doctrine, under which evidence would not be excluded, despite a prior illegal entry, when the evidence is later obtained independently from activities untainted by the initial illegality. See *Murray v. U.S.*, 487 U.S. 533, 537 (1988). A warrant-authorized search would not be independently sourced if the officer's decision to seek a warrant was prompted by what he had

seen during the illegal entry or if the information obtained during the illegal entry was presented to the magistrate and affected the decision to issue the warrant. *Id.*

¶ 148   Clearly, the independent source doctrine would not apply in this case. Stanish made his call to Gates after looking into the cabinet and talking to defendant. It was then that Gates talked to the state's Attorney's office about obtaining a warrant. All information in this case flowed from Liebich and Stanish improperly looking into the cabinet. Even the odor of marijuana was noticed after Stanish re-entered the home, *after* he had spoken to Gates. Any concern about the potential for additional evidence in the affidavit, beyond that credibly testified to by Stanish, is misplaced, as such evidence would be irrelevant, immaterial, and incompetent.

¶ 149   Justice Scalia reminded us that "there is nothing new in the realization that the Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all." *Hicks*, 480 U.S. at 329. Alas, the majority here pushes the law in the opposite direction. Instead, it ignores this admonition and debases the home, the "first among equals" under the Fourth Amendment (*Jardines*, 569 U.S. at 6) to little more than a public place, where the new standard of police conduct is viewed as parallel to that of a private citizen. The majority has opened the home for warrantless examination under the twin canards that such areas are in plain view and that, if your neighbor "could do" something in your house (even if there is no indication that the neighbor is authorized to do it), so may the police. This decision will be cited for a broader definition of plain view in which incriminating character of the object is no longer required to be immediately apparent, the relaxation of the need for a search warrant, and the narrowing of privacy interests in the home.

¶ 150   A radiometer is a device that actually measures radiant energy from a light source. One of the oldest is the Crooke's radiometer, but there are other, more exact instruments in use today that

measure the energy by converting it to electricity through different methods. These devices display the relative strength or quantify the radiant energy of a light source. They all illustrate the fact that the use of a source of light such as a flashlight is a physical effect recognized in the field of physics. It is not insignificant and may be quantitatively measured. See https://www.britannica.com/technology/radiometer#ref76722 (last viewed Sept. 8, 2023). In this particular case, the act of using the flashlight was, in addition to being one of several actions taken in this improper search, the *sine qua non* that established probable cause too late.

¶ 151    I close with a quote from Marcus Tullius Cicero:

>    "True law is right reason in agreement with nature; it is of universal application, unchanging and everlasting; it summons to duty by its commands, and averts from wrongdoing by its prohibitions. And it does not lay its commands or prohibitions upon good men in vain, though neither have any effect on the wicked. It is a sin to try to alter this law, nor is it allowable to attempt to repeal any part of it, and it is impossible to abolish it entirely."[13]

In this case, we have a police officer in the kitchen of a man's home during the mid-morning hours shining a flashlight into a one-inch opening in a padlocked and chained kitchen cabinet in order to peer inside. How is this not a search? How is this not the subversion of the policy of privacy interests contained in the Fourth Amendment, especially as it occurred in the home, the "first among equals" in Fourth Amendment jurisprudence? Neither right reason nor nature is fulfilled by this majority's counterfactual decision, and they cannot be brought into accord by such

_____

[13]https://en.wikiquote.org/wiki/Cicero#:~:text=True%20law%20is%20right%20reason%20in%20agreement%20with,to%20search%20for%20and%20to%20follow%20after%20truth. (Last viewed Nov. 3, 2023.)

maneuvers. The majority's holding and *ratio decidendi* undermine, rather than sustain, the privacy

rights of individuals to be secure in their homes. Therefore, I cannot concur.